PUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges Beales, Huff, O'Brien, AtLee, Malveaux, Athey, Fulton,
           Causey, Friedman, Chaney, Raphael, Lorish, Callins and Frucci
Argued at Richmond, Virginia


ELWOOD LEWIS THOMAS

                                                              OPINION BY
v.        Record No. 1429-22-4                       JUDGE STUART A. RAPHAEL
                                                          SEPTEMBER 17, 2024
COMMONWEALTH OF VIRGINIA


                          UPON A REHEARING EN BANC

                  FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                           Grace Burke Carroll,[1] Judge


          Bryan Kennedy, Senior Assistant Public Defender (Jessica Newton,
          Senior Trial Attorney, on briefs), for appellant.

          Kimberly A. Hackbarth, Senior Assistant Attorney General
          (Jason S. Miyares, Attorney General, on brief), for appellee.


        When he was in his mid-twenties, Elwood Lewis Thomas sexually molested multiple

children while living with his grandmother in a house that she operated as a daycare. As to one

girl whom Thomas abused from the time she was four until she was eight years old, a jury found

Thomas guilty of two counts of aggravated sexual battery, two counts of rape, and two counts of

animate-object penetration. (Circuit Court Case No. FE-2021-37.) The evidence against him

consisted principally of the testimony of the victim—who was age 17 when she testified—and

Thomas's videotaped confession to police. Thomas then pleaded guilty to aggravated sexual

battery of two other young children. (Case Nos. FE-2020-515, FE-2021-38.) At a joint

---

        [1] Judge David Bernhard presided over Thomas's suppression motion. Judge Stephen C.
Shannon considered Thomas's pretrial motion to exclude the Commonwealth's expert. Judge
Grace Burke Carroll presided over the trial and sentencing.

sentencing hearing, the trial court imposed a life sentence on each of the two rape and two animate-object-penetration convictions, and five- or ten-year sentences on the other four convictions.

A divided panel of this Court affirmed in part, reversed in part, and remanded. *Thomas v. Commonwealth*, No. 1429-22-4, 2024 Va. App. LEXIS 133 (Mar. 12, 2024). In Part II of the opinion, all members agreed that the trial court did not abuse its discretion in permitting the Commonwealth's expert to testify about delayed disclosure of sexual abuse by childhood victims. *Id.*, slip op. at 27-31, 2024 Va. App. LEXIS 133, at *37-44. In Part III, all members also agreed that the trial court did not abuse its discretion in sentencing Thomas on the non-jury convictions (Case Nos. FE-2020-515, FE-2021-38). *Id.* at 32-33, 2024 Va. App. LEXIS 133, at *44-47.[2]

In Part I of its opinion, the majority ruled that Thomas's confession should have been suppressed on the ground that his *Miranda* waiver was ineffective and involuntary. *Id.* at 16-27, 2024 Va. App. LEXIS 133, at *21-36. Although police officers administered *Miranda* warnings at the beginning of the custodial interrogation, Thomas's probation officer introduced the officers to Thomas at the start by saying, "I'm going to be here for a little bit, but just go ahead and chat with them today, okay?" *Id.* at 4, 2024 Va. App. LEXIS 133, at *5. The majority concluded this was not a "classic penalty situation" that would make Thomas's privilege against self-incrimination self-executing. *Id.* at 15, 2024 Va. App. LEXIS 133, at *20. Still, the majority found that Thomas's *Miranda* waiver was ineffective without additional warnings that his probation would not be revoked if he exercised his constitutional right to remain silent. *Id.* at 16-21, 2024 Va. App. LEXIS 133, at *21-27. The majority reversed Thomas's jury convictions and

---

[2] The partial dissent would likewise have found no abuse of sentencing discretion for the sentences imposed on the jury convictions (Case No. FE 2021-37). *Thomas*, slip op. at 53 n.26, 2024 Va. App. LEXIS 133, at *76 n.26 (Raphael, J., dissenting in part).

remanded that case for a new trial (Case No. FE-2021-37). *Id.* at 35, 2024 Va. App. LEXIS 133, at *47. The dissent would have affirmed the trial court's finding that "Thomas's will was not overborne and that the waiver of his Fifth Amendment rights and his confession were voluntary." *Id.* at 49, 2024 Va. App. LEXIS 133, at *68 (Raphael, J., dissenting in part). The dissent would also have affirmed the trial court's decision to exclude testimony by Thomas's mother during the guilt phase about his diminished intellectual capacity, which the defense said was relevant to show that Thomas had falsely confessed. *Id.* at 53-57, 2024 Va. App. LEXIS 133, at *76-82.[3]

We granted the Commonwealth's petition for rehearing en banc and stayed the mandate as to all issues decided by the panel pending the decision of this Court sitting en banc. *See* Rule 5A:35(b). As it was not part of our en banc review, Part II of the panel opinion affirming the trial court's ruling allowing the Commonwealth's expert to testify "remains undisturbed," Rule 5A:35(b)(1), and we thus reinstate it. *See Camann v. Commonwealth*, 79 Va. App. 427, 431 (2024) (en banc). We now reject Thomas's remaining challenges, affirm the judgment in full, and uphold Thomas's convictions.

BACKGROUND[4]

We recite the facts on appeal in the light most favorable to the Commonwealth. *Camann*, 79 Va. App. at 431. In doing so, "we 'discard' the defendant's evidence when it conflicts with the Commonwealth's evidence, 'regard as true all the credible evidence favorable to the Commonwealth,' and read 'all fair inferences' in the Commonwealth's favor." *Id.* (quoting *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)).

---

[3] Having found that Thomas's confession should have been suppressed, the majority did not reach that question. *Thomas*, slip op. at 26 n.19, 2024 Va. App. LEXIS 133, at *37 n.19.

[4] Although parts of the record are sealed, this appeal requires unsealing certain portions to resolve the issues raised by Thomas. To the extent that specific facts mentioned here are found in the sealed portions of the record, we unseal those portions only as to those specific facts. The rest remains sealed. *See, e.g.*, *Khine v. Commonwealth*, 75 Va. App. 435, 442 n.1 (2022).

*A. The crimes against A.R.*

In 2008, when Thomas was 24 years old, he was living in his grandmother's house that she operated as a private daycare in Fairfax County. A.R., the victim in Case No. FE-2021-37, was born in May 2004. She was a 17-year-old high-school senior by the time of trial in 2022. She testified that Thomas "raped [her] multiple times" at the daycare between January 1, 2008 and December 31, 2012. The "most memorable time" was in Thomas's bedroom, "downstairs in the basement." Thomas took off his pants, took off her pants, and "put his penis in [her] vagina." A.R. testified that Thomas raped her in the "bathroom" and "sometimes [in] the nursery."

A.R. also recalled that Thomas put his fingers in her vagina more than once during that five-year period. She recalled one instance in 2011 when Thomas stuck his finger in her vagina and "mov[ed] it around" as she sat on his lap at the computer. Thomas told her, "Don't tell anybody"; A.R. "just went upstairs and continued with [her] day." Another such incident occurred when she was sitting with Thomas as they watched her sister play a videogame on an "Xbox."

Thomas repeatedly told A.R. not to tell anyone about the rapes and the sexual touching. She kept it a secret for another seven years.

*B. Thomas's conviction, sentence, and probation for an unrelated sex offense*

Thomas was arrested in 2012 and convicted in 2013 on his guilty plea to aggravated sexual battery of a different child under 13 years of age.[5] The trial court sentenced him to 8 years in prison with 7 years suspended and 20 years' supervised probation. During the investigation of that offense, Thomas had "at least a dozen" contacts with police. One time, he made a voluntary statement to police after he received *Miranda* warnings.

---

[5] According to the conviction order, Thomas committed that crime in September 2002.

Thomas told officers at the time about a different "[k]id I [t]ouched," a girl with the same first name and relationship to him as A.R. A.R. was then eight years old. When her mother asked if Thomas had touched her, A.R. said "no." Investigators spoke with A.R. at the time. A.R. did not reveal the abuse but said it was "not okay to touch her private parts or butt."

Fairfax County Probation Officer Joseph Samluk prepared the presentence-investigation report for Thomas's 2013 conviction, and Samluk later became Thomas's probation officer upon Thomas's release from custody in 2014. Thomas's supervised probation included sex-offender treatment, which Thomas completed. Samluk testified that he had "a very good rapport" with Thomas and that Thomas was "honest with [him] about everything."

### C. Thomas confesses to multiple crimes against other children

In July 2019, at age 15, A.R. finally told her mother about the sexual abuse at the daycare. Her mother testified that A.R. was "very frightened" when revealing that Thomas had "put his privates inside her private[s]."

After A.R.'s mother called the police, Fairfax County Police Detectives Steven Carter and Thomas J. Gadell, Jr. were assigned to investigate. On July 26, 2019, Detective Carter observed a video in which Anissa Tanksley, a forensic interviewer, questioned A.R. about the abuse.

Obtaining a warrant for Thomas's arrest, the detectives arranged with Probation Officer Samluk to arrest Thomas when he reported to Samluk's office for a probation meeting. The detectives said they chose that location because Thomas lived nearby, they did not know how he would react, and they wanted a location that could be controlled and secured for safety. Samluk testified that "it's a normal procedure for the probation office to coordinate arrests with the Fairfax County Police Department." He said that "it happens all the time."

After his arrest, Thomas was transported by patrol car to police headquarters. Samluk drove there separately, having been asked by Detective Carter to come. Thomas was placed in

an interrogation room and handcuffed to the table. A videorecording introduced at the suppression hearing captured what happened. Thomas was there for about five hours; the interview by the detectives lasted about three hours.

As Thomas had not yet eaten, the detectives got him two McDonald's breakfast sandwiches. One of the detectives uncuffed Thomas's dominant hand so he could eat breakfast and drink from a water bottle. As the detectives did not know Thomas, they asked Samluk to introduce them. Neither detective told Samluk how to introduce them or what to say. Detective Carter testified, "We wanted to treat Mr. Thomas respectfully and professionally, and we thought it would be important to have Mr. Samluk just introduce us as fellow professionals, as just who we were, and then leave."

Samluk told Thomas:

> This is Detective Carter, Detective Gadell. They need to talk to you about some things. I'm going to be here for a little bit, but just go ahead and chat with them today. Okay?

Thomas responded, "yeah," after which Samluk said he needed to "check on some things" and stepped out.

Detective Carter then reintroduced himself and Detective Gadell, and the detectives took down Thomas's name, birthday, address, cellphone number, and social-security number. The detectives spent nearly four minutes with Thomas going over his *Miranda* rights, using a preprinted form that they handed to Thomas so he could follow along. Thomas said he understood his rights and signed the form, acknowledging that he agreed to speak with police without a lawyer present.

After letting Thomas use the bathroom, the detectives removed the handcuffs and began asking about his background, proceeding to question him about his sexual contacts with children. About the 2012 investigation, Thomas said he had accidentally touched a young girl's breasts.

About his background, Thomas described having been sexually abused himself. He went on to describe many times when he had sexual contact with children.

Thomas said that, when he was in his mid-20s, he had sexual contact with C.R., who was then four or five years old. Next came A.R., whose name Thomas also volunteered.

Thomas admitted fondling A.R.'s vagina six or seven times and putting his mouth on her vagina three or four times, but he denied that it went further than that. He stopped licking her vagina when she cried out that "it hurt," saying he hadn't mean to hurt her. He said the incidents with A.R. occurred at his grandmother's house, when A.R. was about seven or eight years old.

Thomas named about nine other children with whom he had sexual contact. He admitted to the detectives, "I have an addiction to sex. It started out [earlier] and it's never stopped and never gone away." The detectives suggested that Thomas write handwritten notes to the children he regretted having touched; Thomas wrote apologies to A.R. and C.R.

### D. Proceedings below

In January 2021, a grand jury returned a ten-count indictment against Thomas for crimes against A.R. (FE-2021-37); a nine-count indictment for crimes against C.R. (FE-2020-515); and a three-count indictment for crimes against T.W. (FE-2021-38).

Thomas moved to suppress the videotaped confession on the ground that his "waiver of his Fifth Amendment Rights was not voluntary due to his probation officer's statements prior to the interview." At the suppression hearing, the trial court admitted the videotaped interview and took testimony from both detectives and the probation officer. The court also admitted Thomas's signed *Miranda* waiver form. The court denied the motion to suppress. It found that Thomas voluntarily waived his *Miranda* rights without any threat by the probation officer or the detectives to revoke his probation if he invoked his right to remain silent or right to counsel.

The trial court conducted a four-day jury trial on the charges involving A.R. (Case No. FE-2021-37). The jury heard A.R. testify as recounted above. The jury also heard from A.R.'s mother, Detective Carter, two other officers, and forensic interviewer Tanksley. The court received into evidence an eight-minute excerpt of Thomas's video interrogation in which he discussed his sexual contact with A.R, and his handwritten apology to her. The court overruled Thomas's objections to Tanksley's testimony and found her qualified to testify as an expert in child-forensic interviewing.

At the close of the Commonwealth's case, the court granted Thomas's motion to strike Count V, which had charged Thomas for "the last time" he raped A.R., because A.R. testified that she could not remember the last time it happened. The court overruled the motion to strike the remaining counts.

The defense sought to call as its only witness Thomas's mother, Jacqueline Thomas Black. The defense proffered that she would testify about Thomas's intellectual impairment, not to negate mens rea, but to show that Thomas was susceptible to suggestion and thus falsely confessed to crimes against A.R. To support the proffer, the trial court permitted the defense to question Black outside the jury's presence. The trial court excluded Black's testimony as "too speculative" to show that Thomas had falsely confessed.

After the defense rested, the court granted Thomas's motion to strike Count I.[6] The court denied the motion to strike the remaining counts, finding that A.R. was not inherently incredible and that sufficient evidence corroborated Thomas's confession.

The jury found Thomas guilty of two counts of aggravated sexual battery (Counts II-III), two counts of rape (Counts IV, VI), and two counts of animate-object penetration (Counts IX-X).

---

[6] Count I charged Thomas with performing cunnilingus on a child. The court agreed with the defense that, although Thomas admitted in his interview to having put his mouth on A.R.'s vagina, there was no testimony from A.R. on that point and no evidence of penetration.

The jury acquitted Thomas of two counts of raping A.R. in the nursery (Counts VII-VIII). The trial court denied Thomas's motion to set aside the verdict.

Thomas later pleaded guilty to one count of aggravated sexual battery of T.W. (Case No. FE-2021-38) and one count of sexual battery of C.R. (Case No. FE-2020-515). The Commonwealth nolle prossed the remaining charges as to those victims, and Thomas agreed to be sentenced on his guilty pleas at the same time as sentencing for the crimes against A.R.

The Commonwealth proffered the facts supporting the charges to which Thomas pleaded guilty. When T.W. was five years old at the daycare in 2009 or 2010, Thomas repeatedly rubbed his fingers on her bare vagina, something Thomas admitted during the police interview. Thomas explained that he had failed to get enough satisfaction from masturbating to porn on his computer, so he got it with T.W. When C.R. was four or five years old, Thomas repeatedly put his mouth on C.R.'s penis and put his penis in C.R.'s mouth. Thomas regretted having once ejaculated into C.R.'s mouth. Afterward, Thomas told C.R. to "spit it out" and felt ashamed, limiting his sexual contact with C.R. afterward to touching him between the legs.

### E. Thomas's sentencing hearing

At the sentencing hearing, the trial court considered the presentence investigation, memoranda from the parties, and victim-impact statements. Thomas presented testimony from his stepfather and from Probation Officer Samluk. The Commonwealth presented testimony from A.R. and C.R.'s aunt, who described the effects of the abuse on her niece and nephew. The Commonwealth also introduced portions of Thomas's videotaped confession. The sentencing guidelines called for a total sentence ranging from incarceration for 13 years and 8 months to 29 years and 4 months, with a midpoint of 24 years and 5 months.

The trial court sentenced Thomas to life in prison on four of the felony convictions as to A.R. and to five- or ten-year sentences on the remaining convictions:

| | | | |
|---|---|---|---|
| Crimes against A.R. (Case No. FE-2021-37) | Aggravated Sexual Battery (Count II) (Code § 18.2-67.3) | 5 years |
| | Aggravated Sexual Battery (Count III) (Code § 18.2-67.3) | 5 years |
| | Rape (Count IV) (Code § 18.2-61) | Life in prison |
| | Rape (Count VI) (Code § 18.2-61) | Life in prison |
| | Animate-object penetration (Count IX) (Code § 18.2-67.2) | Life in prison |
| | Animate-object penetration (Count X) (Code § 18.2-67.2) | Life in prison |
| Crime against T.W. (Case No. FE-2021-38) | Aggravated Sexual Battery (Code § 18.2-67.3) | 10 years |
| Crime against C.R. (Case No. FE-2020-515) | Aggravated Sexual Battery (Code § 18.2-67.3) | 10 years |

The court determined that an upward departure from the sentencing guidelines was warranted because of the severe and "indiscriminate" nature of the crimes. The court found that Thomas "ch[o]se children because they were so easy to be abused. He is a serial pedophile. The Court has no way of protecting the community from this man other than to impose a life sentence."

Thomas noted a timely appeal, arguing that the trial court erred in

- excluding Black's testimony;

- failing to exclude forensic interviewer Tanksley's testimony;

- denying Thomas's motion to suppress his videotaped confession; and

- failing to consider mitigating evidence at sentencing and abusing its sentencing discretion.

### F. The panel opinion

A divided panel of this Court held that Thomas's confession should have been suppressed on account of the probation officer's involvement introducing the detectives at the start of the interview. *Thomas*, slip op. at 16-27, 2024 Va. App. LEXIS 133, at *21-35. All members of the panel agreed there was no error in permitting Tanksley's testimony. *Id.* at 27-31, 2024 Va. App. LEXIS 133, at *37-44. The majority did not reach whether Black's testimony should have been excluded, *id.* at 26 n.19, 2024 Va. App. LEXIS 133, at *37 n.19, while the dissent would have

- 10 -

found no abuse of discretion in that ruling, *id.* at 53-57, 2024 Va. App. LEXIS 133, at \*76-82. All members agreed that the trial court did not abuse its discretion when sentencing Thomas on the non-jury convictions (Case Nos. FE-2020-515, FE-2021-38). *Id.* at 32-33, 2024 Va. App. LEXIS 133, at \*44-47.

We granted the Commonwealth's petition for rehearing en banc on all questions except whether Tanksley's testimony was properly excluded.

ANALYSIS

*I. The trial court properly denied the motion to suppress.*

The Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." The Due Process Clause of the Fourteenth Amendment also protects the privilege against self-incrimination from "abridgment by the States." *Malloy v. Hogan*, 378 U.S. 1, 6 (1964).

In the seminal case of *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held "that when an individual is taken into custody . . . and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Id.* at 478. To protect the privilege, the Court announced the now-familiar prophylactic warnings that must be provided "to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored." *Id.* at 479.

> [The suspect] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires . . . . After such warnings have been given, . . . the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no

> evidence obtained as a result of interrogation can be used against him.

*Id.*

A defendant who makes incriminating statements after being warned under *Miranda* may move to suppress those statements on the ground that his *Miranda* waiver was not voluntary, knowing, and intelligent, as well as on the ground that his confession itself was coerced and not voluntary. *See, e.g.*, *Rodriguez v. Commonwealth*, 40 Va. App. 144, 155 (2003). Thomas raises only the former challenge here. He argues that the probation officer's participation in the interview, introducing the detectives and asking Thomas to "chat with them," prevented him from making a voluntary, knowing, and intelligent waiver of his *Miranda* rights.

### A. Standard of Review

The parties disagree about the standard of review that applies on appeal when considering whether a defendant has validly waived *Miranda* rights. Relying on *Harrison v. Commonwealth*, 244 Va. 576 (1982), the Commonwealth says that the trial court's finding of a *Miranda* waiver is a finding of fact subject to deferential review on appeal. Commonwealth Br. 22. Relying on *Tirado v. Commonwealth*, 296 Va. 15 (2018), Thomas argues that we should give de novo review to whether his *Miranda* waiver was voluntary. Reply Br. 1.

Although that difference in the standard of review does not affect the outcome here, *see infra* at 19, the Commonwealth is correct that *Harrison* requires deferential review of the trial court's finding of a *Miranda* waiver. As *Harrison* explained, 244 Va. at 580-81, the United States Supreme Court held in *Miller v. Fenton*, 474 U.S. 104, 110 (1985), that when determining the admissibility of *a confession*, "the ultimate issue of 'voluntariness' is a legal question." But *Miller* did not reach whether the same standard applies to "the 'voluntariness' of a waiver of *Miranda* rights." *Id.* at 110 n.3. *Harrison* held that the two standards are different and that a *Miranda* waiver is a finding "of fact" that carries a "presumption of correctness":

> Unlike the voluntariness inquiry relevant to the admissibility of a confession where the question is one of law subject to an independent review by an appellate court, *Miller*, 474 U.S. at 115, the inquiry whether a waiver of *Miranda* rights was made knowingly and intelligently is a question of fact, and the trial court's resolution of that question is entitled on appeal to a presumption of correctness.

*Harrison*, 244 Va. at 581.

Our Supreme Court has generally applied that deferential standard to *Miranda* waivers ever since.[7] So have we.[8] Thus, in *Rodriguez*, we declined to entertain the appellant's argument that the "standard of review is 'wrong' and that Virginia courts 'ought to undertake an independent review of' the voluntariness of one's waiver of *Miranda* rights, just as they do in reviewing the voluntariness of a confession." 40 Va. App. at 156 n.2.

We disagree with Thomas that *Tirado* silently overruled *Harrison* and its progeny. Thomas misreads this passage from *Tirado*:

> "[W]hether the [*Miranda*] waiver was made knowingly and intelligently is a question of fact," and the circuit court's determination on this issue "will not be set aside on appeal unless plainly wrong." On the other hand, whether *a statement* was voluntary is a "legal rather than factual question."

---

[7] *See Angel v. Commonwealth*, 281 Va. 248, 258 (2011) ("The determination of whether the waiver was made knowingly and intelligently is a question of fact that will not be set aside on appeal unless plainly wrong."); *Jackson v. Commonwealth*, 266 Va. 423, 432 (2003) (same). *But see Burket v. Commonwealth*, 248 Va. 596, 612 (1994) ("Based on the trial court's findings and *our independent review* of the record, we hold, as a matter of law, that Burket's waiver of his *Miranda* rights was made knowingly, voluntarily, and intelligently." (emphasis added)).

[8] *See Keepers v. Commonwealth*, 72 Va. App. 17, 37 (2020) ("This decision is a question of fact, and 'the circuit court's determination on this issue "will not be set aside on appeal unless plainly wrong."'" (quoting *Tirado*, 296 Va. at 29)); *Overbey v. Commonwealth*, 65 Va. App. 636, 649 (2015) (following *Harrison*); *Knox v. Commonwealth*, 52 Va. App. 366, 373 (2008) (same); *Goodwin v. Commonwealth*, 3 Va. App. 249, 253 (1986) ("The Commonwealth submits that this issue is one of fact and we agree."). *But see Medley v. Commonwealth*, 44 Va. App. 19, 34 (2004) (en banc) ("[W]hether Medley waived his rights under *Miranda* is a mixed question of law and fact, and while we are bound by the facts and reasonable inferences that flow from those facts as they relate to Medley's words and conduct, we are not bound by the legal conclusion of the trial court that Medley 'didn't waive his rights.'" (citing *Burket*, 248 Va. at 611)).

296 Va. at 27-28 (emphasis added) (citations omitted) (first quoting *Angel v. Commonwealth*, 281 Va. 248, 257-58 (2011); and then quoting *Gray v. Commonwealth*, 233 Va. 313, 324 (1987)). In referencing "whether a statement was voluntary" in the second sentence, the Court referred to whether the defendant's inculpatory "statement" was voluntary, not whether the *Miranda* "waiver" was voluntary. The citation to *Gray* supports that reading because *Gray* relied on *Miller*'s holding about the voluntariness of the confession. *See Gray*, 233 Va. at 324 (citing *Miller*, 474 U.S. at 110).

Clearer language in *Tirado* would be needed before we could conclude that *Tirado* silently overruled *Harrison* and its progeny.[9] Indeed, our Supreme Court has "direct[ed] that "'if a precedent of [the Virginia Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, lower courts should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.""" *Commonwealth v. Watson*, 297 Va. 355, 360 n.* (2019) (quoting *Clark v. Va. Dep't of State Police*, 292 Va. 725, 736 (2016)); *cf. Mallory v. Norfolk S. Ry.*, 600 U.S. 122, 136 (2023) (holding that the Pennsylvania Supreme Court "clearly erred" by interpreting "intervening decisions" from the U.S. Supreme Court to have "implicitly overruled" clear precedent). Until

---

[9] We acknowledge that a recent panel decision of this Court improperly added a second layer of review to the *Miranda* waiver question. *See Ayala v. Commonwealth*, 79 Va. App. 41, 50 (2023) (correctly recognizing that whether a *Miranda* waiver was "knowing and intelligent" is a "question of fact" but incorrectly stating that whether the "waiver was voluntary . . . is a legal question" (citing *Tirado*, 79 Va. App. at 28)). *Ayala* conflicts with *Keepers*, which read *Tirado* to support the more deferential standard for reviewing *Miranda* waivers, treating it purely as "a question of fact." *Keepers*, 72 Va. App. at 37 (citing *Tirado*, 79 Va. App. at 29). To avoid any confusion going forward, we limit that language in *Ayala* as inconsistent with the *Harrison* line of cases, including *Keepers*. This does not affect the outcome in *Ayala*, in which the panel concluded that the waiver was voluntary. *See Ayala*, 79 Va. App. at 51-55. It merely provided an additional, albeit unnecessary, layer of review for the trial court's well-supported finding that the *Miranda* waiver there was voluntary.

our Supreme Court or the Supreme Court of the United States directs otherwise, we must continue to follow the *Harrison* line of cases.[10]

## B. The Miranda waiver was voluntary, knowing, and intelligent.

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (alteration in original) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

> The waiver inquiry "has two distinct dimensions": waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*Id.* at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). A waiver may be express or implied. *Id.* at 383. "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.* at 384.

---

[10] For the sake of completeness, we acknowledge that the federal precedent on which *Harrison* relied was brought into question by later precedent. *Harrison* followed the Seventh Circuit's holding in *Bryan v. Warden, Indiana State Reformatory*, 820 F.2d 217 (7th Cir. 1987), that "whether a waiver of *Miranda* is voluntary is a factual determination." *See Harrison*, 244 Va. at 581 (citing *Bryan*, 820 F.2d at 220). But the Seventh Circuit changed the standard of review a decade later in *United States v. Mills*, 122 F.3d 346 (7th Cir. 1997), holding that "the ultimate issue of the voluntariness of a waiver of *Miranda* rights ought to be reviewed de novo by an appellate court." *Id.* at 350. *Mills* explained that every federal circuit to have considered the question had so held, and it was time for the Seventh Circuit "to join the rest of the Country." *Id.* at 349-50 & n.3 (collecting cases); *see also State v. Mattox*, 124 P.3d 6, 13 (Kan. 2005) ("[A]ll the federal circuit courts of appeal regard the voluntariness of a waiver of *Miranda* rights as an issue of law."). But whether these considerations warrant overruling *Harrison* is a matter for our Supreme Court to decide, not this Court.

"Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Tirado*, 296 Va. at 28 (quoting *Moran*, 475 U.S. at 421). The "totality of all the surrounding circumstances" includes "the conduct of the police," *id.* (quoting *Gray*, 233 Va. at 324), as well as "the defendant's age, education, language, alienage, experience with police, and whether the defendant stated that he understood his rights as read to him," *id.* at 29.

At the suppression hearing below, the trial court "thought the most important" evidence on this question was the video of Thomas's interview. As shown in the video, Probation Officer Samluk introduced Detectives Carter and Gadell by saying, "they need to talk to you about some things. I'm going to be here for a little bit, but just go ahead and chat with them today. Okay?" After Samluk left the room, Detective Carter introduced himself and his colleague again and said the detectives needed to "go over some administrative stuff first." Carter took down Thomas's name, address, and identifying information.

Carter then said he needed to go over Thomas's *Miranda* rights and wanted to answer any questions he had about the *Miranda* waiver form. Carter gave Thomas a copy of the form to follow along. Detective Carter said he was investigating Thomas for sexual assault. Thomas showed that he knew what that meant: he tilted his head left and right before tilting forward and resting his head in the palm of his hand for several seconds, appearing dejected.

Detective Carter then carefully reviewed with Thomas each *Miranda* warning. Carter read the first one aloud: "I have the right to remain silent. I am not required to say anything to anyone at any time or to answer any questions." Carter paused and asked Thomas, "Does that one make sense?" Thomas nodded his head in the affirmative. Next, Carter read aloud, "Anything I do or say can and will be used against me in a court of law." Carter asked Thomas,

"Understand?" Thomas again nodded in the affirmative. Carter then added, "if you have questions, please let me know, okay?" And Thomas again nodded his head that he understood.

Detective Carter next read, "I have the right to talk to a lawyer before being questioned, and I also have the right to have the lawyer with me while being questioned." Carter asked, "Pretty straightforward?" Thomas again nodded his head in the affirmative and said, "Yeah."

Thomas did not nod or react after Carter read the fourth and fifth warnings aloud, elaborating on Thomas's right to counsel.[11] But after reading all five warnings, Carter asked if "all five" of them "make sense? They're all pretty straightforward but I always want to doublecheck to make sure." Thomas responded, "Yeah—I can't believe this is happening again."

Carter then read Thomas the "Consent to Speak" text on the waiver form, where the suspect's signature was requested. It said, "I know what my rights are. I am willing to make a statement without a lawyer present. I understand and I know what I am doing. No promises or threats have been made to me by anyone." Carter told Thomas, "You don't have to sign it. It does help if you do. But you can still agree to talk to us if you don't want to sign it. So it's up to you. Do you mind signing right here for me?" Thomas responded, "Yeah," and he signed the waiver form.

The officers then took a bathroom break, telling Thomas that he could use the bathroom whenever he needed. When the group returned from the first bathroom break, the detectives removed the handcuff securing Thomas's left arm and conducted the rest of the interview

---

[11] Those warnings were:

4. If I cannot afford a lawyer, and want one, one will be provided to me.

5. If I want to answer questions now without a lawyer present, I will still have the right to stop answering questions at any time. I also have the right to stop answering questions at any time if I want to talk to a lawyer.

without restraints. Thomas proceeded to make the incriminating statements described above, eventually volunteering that A.R. was one of the children he had sexually touched.

At the suppression hearing, the detectives and the probation officer all testified that they did not intend to trick Thomas into speaking with them. The detectives' tones were "[c]onversational," "friendly, professional and respectful." They never threatened Thomas. The trial court found that the detectives were "very professional, they were kind to [Thomas], they got him food, they got him at ease." The trial court also found that Probation Officer Samluk introduced Thomas to the detectives because "he was just being helpful and courteous." As subsidiary findings of fact, those conclusions are well-supported by the record and, therefore, cannot be second-guessed on appeal. *See Secret v. Commonwealth*, 296 Va. 204, 225-26 (2018); *see also Commonwealth v. Barney*, 302 Va. 84, 97 (2023) ("[W]e, on appellate review, view video evidence not to determine what we think happened, but for the limited purpose of determining whether any rational factfinder could have viewed it as the [factfinder] did." (second alteration in original) (quoting *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022))).

On the ultimate question of voluntariness, the trial court also found that when Samluk asked Thomas to "chat with them a little bit," it did not mean "'Answer their questions truthfully . . . or else,' in so many words, . . . using the power of probation." Instead, it was, "like the police said, an introduction," "trying to make the accused feel at ease, and he appeared at ease." Continuing, the court concluded that Thomas voluntarily waived his privilege against self-incrimination after being informed of his right to remain silent:

> [I]t appeared that based on his—partially based on his prior experiences, on his demeanor, that he knew full well what was going on and that he made [a] voluntary choice to waive his right against self-incrimination after he was advised that he didn't need to speak to the police and that it wouldn't be held against him . . . .
>
> And maybe there was an element there that . . . the officers were very professional, they were kind to him, they got him food, they

- 18 -

got him at ease, and he took the occasion to kind of pour his heart out and maybe take responsibility for things that he indicated he had done . . . .

But under the totality of the circumstances, I find that his Miranda waiver was voluntary, knowing and intelligent . . . .

We hold that the evidence amply supports the trial court's factual finding that Thomas waived his *Miranda* rights. Thomas was aware of "both the nature of the right being abandoned and the consequences of the decision to abandon it." *Tirado*, 296 Va. at 28. He acknowledged both orally and in writing that, "Anything I do or say can and will be used against me in a court of law." The video, in particular, supports the trial court's finding that Thomas "knew full well what was going on" and that he made a knowing, voluntary, and intelligent choice to waive his right against self-incrimination after being advised of the consequences. And even assuming for argument's sake that the independent-appellate-review standard applied, *see* Part I.A *supra*, we would conclude on de novo review that Thomas's *Miranda* waiver was voluntary, knowing, and intelligent.

### C. Thomas's counterarguments are unpersuasive.

Thomas resists that conclusion, arguing that his *Miranda* waiver was coerced and involuntary on several grounds. We are not persuaded.

First, we disagree with Thomas that the *Miranda* waiver was rendered ineffective because "the police interrogated [him] knowing that he was intellectually disabled or 'mentally retarded.'" Thomas Br. 40. It is true that both detectives testified that they reviewed investigative reports containing those descriptions of his mental capabilities.[12] But as Thomas

---

[12] At sentencing, defense counsel represented that Thomas was "diagnosed with numerous disabilities in his early developmental years that required frequent medical support and intensive supervision, including severe ADHD and Tourette's syndrome." The Tourette's syndrome was diagnosed "after [Thomas] developed motor tics including intense facial grimacing and head snapping."

told the detectives at the beginning of the interview, he had graduated from the 12th grade at a special-education school. And as shown by his review of the *Miranda* waiver form and his notes of apology, Thomas could read and write.

An otherwise valid confession or *Miranda* waiver is not rendered invalid because the defendant has a diminished mental capacity. For one thing, we have repeatedly held that persons with diminished mental capacities may still be capable of voluntarily confessing or waiving their *Miranda* rights,[13] including persons who attended special-education schools and had fewer years of schooling than Thomas.[14] A defendant's prior experience receiving *Miranda* warnings may also bolster the conclusion that a later *Miranda* waiver was made voluntarily.[15]

For another thing, "'while mental condition is surely relevant to an individual's susceptibility to police coercion,' [a defendant's] 'mental condition, by itself and apart from its relation to official coercion' can never 'dispose of the inquiry into constitutional

---

[13] *See, e.g.*, *Yeatts v. Commonwealth*, 242 Va. 121, 131-32 (1991) (holding *Miranda* waiver voluntary in spite of defendant's "low intelligence" and "stress" he suffered from "drugs, alcohol, and loss of sleep"); *Simpson v. Commonwealth*, 227 Va. 557, 563-64 (1984) (holding *Miranda* waiver voluntary despite that defendant had an IQ of 78 and "functioned at the second-grade level"); *Terrell v. Commonwealth*, 12 Va. App. 285, 292 (1991) (holding that the "confession was voluntary" even though defendant had "an IQ between 71 and 75"); *Goodwin v. Commonwealth*, 3 Va. App. 249, 254-57 (1986) (holding *Miranda* waiver voluntary even though defendant read at a first-grade level and had an IQ of 56, "placing him in the educable mentally retarded range").

[14] *See, e.g.*, *Washington v. Commonwealth*, 228 Va. 535, 545, 547-48 (1984) (holding *Miranda* waiver voluntary despite that defendant's "I.Q. was 69, a score at the 'upper limits of mild mental retardation,'" and defendant had only "a ninth grade education . . . but had attended 'special education' classes"); *Robinson v. Commonwealth*, 63 Va. App. 302, 309, 313-14 (2014) (finding confession voluntary despite that defendant "had been in an alternative school since third grade" and "read at a seventh grade level").

[15] *See, e.g.*, *Correll v. Commonwealth*, 232 Va. 454, 464 (1987) ("Despite his low IQ of 68, Correll had on a number of prior occasions dealt with the police and received *Miranda* warnings. He was capable of effecting a valid waiver."); *Overbey*, 65 Va. App. at 651 n.7 ("This prior exposure to criminal proceedings [and receiving *Miranda* warnings] also undermines appellant's claim that his waiver was not knowingly and intelligently given because of his low IQ of 78.").

"voluntariness."'"" *Secret*, 296 Va. at 227 n.10 (quoting *Colorado v. Connelly*, 479 U.S. 157, 164-65 (1986)) (considering mental condition in the context of a voluntary confession). "That is because '*Miranda* protects defendants *against government coercion* leading them to surrender rights protected by the Fifth Amendment; it goes no further than that.'" *Id.* (emphasis added) (quoting *Connelly*, 479 U.S. at 170-71). So we have rejected challenges to the voluntariness of a confession or of a *Miranda* waiver by people with low IQs when the police did not use coercive tactics to exploit such vulnerabilities. In *Bottenfield v. Commonwealth*, 25 Va. App. 316 (1997), for instance, we found the confession voluntary even though the appellant had an IQ of 61. *Id.* at 322. We explained that the officer "did not use complex questions or other tactics aimed at exploiting appellant's disability in order to compel an unintentional confession. On the contrary, [the officer] testified that he framed his questions simply and repeated them several times when it appeared that appellant did not understand." *Id.* at 326-27.

Thomas's involuntariness argument here fails for all those reasons. The video interview and signed waiver form show that Thomas's *Miranda* waiver was voluntary despite any reduced intellectual capacity. As the trial court noted, Thomas was familiar with *Miranda* warnings, "partially based on his prior experiences"—his multiple encounters with police that led to the 2013 conviction. And the video interview fails to show that the detectives used coercive tactics to exploit any intellectual shortcomings.

Second, we disagree with Thomas that the *Miranda* warnings were rendered ineffective on the ground that Detective Carter downplayed their importance as a "mere formality" or "procedural matter." Thomas Br. 35. We have rejected a similar claim that police "diluted" *Miranda* warnings by downplaying their significance as "just procedural stuff." *Keepers v. Commonwealth*, 72 Va. App. 17, 29, 37 (2020). What is important is that Thomas was apprised of his *Miranda* rights for nearly four minutes. *Cf. id.* at 29 (warnings lasted "approximately two

minutes"). Thomas was told he "was free to refuse to answer any questions and could stop talking any time." *Id.* at 37. And he "signed a pre-printed form listing [his] *Miranda* warnings" without "express[ing] any confusion or hesitation." *Id.* Whether a defendant fails to fully appreciate that it may harm his legal interest to speak with law-enforcement officers, rather than remain silent, "does not affect the validity of his waiver." *Tirado*, 296 Va. at 29 (quoting *United States v. Yunis*, 859 F.2d 953, 965 (D.C. Cir. 1988)). Thomas's "express written and verbal statements of waiver of his rights are strong proof of the validity of his waiver." *Angel*, 281 Va. at 259.

Third, we disagree with Thomas that his *Miranda* waiver was invalid because of the probation officer's involvement introducing the detectives at the beginning of the interrogation. Thomas claims that Samluk's introducing the detectives and asking Thomas to "chat" with them was coercive because a condition of his probation required Thomas to be "truthful" with his probation officer and "follow" the probation officer's instructions. He argues that the detectives chose "a trusted face" to introduce them. And he claims that his decision to speak with the detectives was "not a free and unconstrained choice" because "it was a conditioned response from years of following his probation officer's instructions." Thomas Br. 30.

But as the trial court found, Probation Officer Samluk introduced Thomas to the detectives because "he was just being helpful and courteous." When Samluk asked Thomas to "chat with them a little bit," it did not mean, "'Answer their questions truthfully . . . or else,' in so many words, . . . using the power of probation." Instead, it was, "like the police said, an introduction," "trying to make the accused feel at ease, and he appeared at ease."

That finding is supported by the record. Detective Carter testified that the detectives asked Samluk to introduce them to Thomas because they "wanted to treat Mr. Thomas respectfully and professionally, and we thought it would be important to have Mr. Samluk just

introduce us as fellow professionals, as just who we were, and then leave." For his part, Samluk testified that "these are routine things that we do to help the police."[16]

Thomas also conflates the pressure that a probationer would naturally feel to speak with his probation officer and the police in this situation with whether Thomas was coerced into waiving his privilege against self-incrimination. The defendant in *Minnesota v. Murphy*, 465 U.S. 420 (1984), was a probationer whose conditions of probation likewise required that he "be truthful with the probation officer 'in all matters.' Failure to comply. . . could result in his return to the sentencing court for a probation revocation hearing." *Id.* at 422. When the probation officer confronted Murphy in a noncustodial setting about an unsolved rape and murder, Murphy confessed to the crimes. *Id.* at 423-24. The Court rejected Murphy's claim that his probationary status coerced him into confessing, holding that "since Murphy revealed incriminating information instead of timely asserting his Fifth Amendment privilege, his disclosures were not compelled incriminations." *Id.* at 440.

The Court explained "that the general obligation to appear and answer questions truthfully did not in itself convert Murphy's otherwise voluntary statements into compelled ones." *Id.* at 427. "In that respect, Murphy was in no better position than the ordinary witness at a trial or before a grand jury who is subpoenaed, sworn to tell the truth, and obligated to answer on the pain of contempt, unless he invokes the privilege . . . ." *Id.* "The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment

---

[16] The panel majority overlooked Samluk's testimony when emphasizing that the two detectives here "had never enlisted a suspect's probation officer in this way during a custodial interrogation despite Carter having conducted 'hundreds' of interviews." *Thomas*, slip op. at 16, 2024 Va. App. LEXIS 133, at *22. Thomas has not argued that point on brief, and for good reason. Detective Carter testified that none of the custodial interrogations that he could recall involved a suspect on probation. And Detective Gadell was less experienced than Carter, having conducted "[m]aybe over a dozen" interrogations at that point.

*unless the witness is required to answer over his valid claim of the privilege.*"  *Id.* (emphasis added).

At least since *Murphy*, "It has long been settled that the privilege 'generally is not self-executing' and that a witness who desires its protection "'must claim it.'"  *Salinas v. Texas*, 570 U.S. 178, 181 (2013) (plurality opinion) (quoting *Murphy*, 465 U.S. at 425, 427).  This is sometimes called the "invocation requirement."  *Id.* at 183, 186-90.  "Thus it is that a witness confronted with questions . . . must assert the privilege rather than answer if he desires not to incriminate himself."  *Murphy*, 465 U.S. at 429.

On the other hand, if the government were to expressly or implicitly "assert[] that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." *Id.* at 435.  For instance, the Ninth Circuit held in *United States v. Saechao*, 418 F.3d 1073 (9th Cir. 2005), on which Thomas relies, that Oregon law created that "classic penalty situation" by treating a probationer's failure to "answer[]" all questions as grounds to revoke probation.  *Id.* at 1079.  *See United States v. Linville*, 60 F.4th 890, 898 (4th Cir. 2023) (explaining that, "under Oregon law [in *Saechao*], 'an invocation of the privilege does not constitute compliance with Oregon's probation conditions' requiring probationers to 'promptly and truthfully answer all reasonable inquiries'" (quoting *Saechao*, 418 F.3d at 1079)).

Not so here.  While Thomas's probation conditions required that he be "truthful" with his probation officer and "follow" his instructions, those instructions, as in *Murphy*, "said nothing about his freedom to decline to answer particular questions and certainly contained no suggestion that his probation was conditional on waiving his Fifth Amendment privilege with respect to further criminal prosecution."  465 U.S. at 437.  The record also lacks evidence that anyone

- 24 -

expressly or implicitly threatened Thomas with probation revocation if he invoked his privilege against self-incrimination. "There is no direct evidence that [Thomas] confessed because he feared that his probation would be revoked if he remained silent." *Id.* And even if Thomas had subjectively believed "that his probation might be revoked for exercising the Fifth Amendment privilege, that belief would not have been reasonable" because the Supreme Court has "made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." *Id.* at 438.

To be sure, *Murphy* did not involve a probationer who was questioned while in custody. The Court said that "[a] different question would be presented if he had been interviewed by his probation officer while being held in police custody or by the police themselves in a custodial setting." *Id.* at 429 n.5.

But *Murphy*'s principles apply equally in a custodial setting as long as *Miranda* warnings have been properly administered and the government does not expressly or implicitly threaten to revoke probation to deter the defendant from asserting his privilege against self-incrimination. "[T]he primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves. '[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process.'" *Davis v. United States*, 512 U.S. 452, 460 (1994) (quoting *Moran*, 475 U.S. at 427). Thus, once proper *Miranda* warnings are given, it resets the defendant's obligation to invoke his right to remain silent if he wants further questioning to stop. *See Berghuis*, 560 U.S. at 381 ("[A]n accused who wants to invoke his or her right to remain silent [must] do so unambiguously."); *Thomas v. Commonwealth*, 72 Va. App. 560, 574 (2020) ("Both the right to remain silent and the right to counsel require the suspect to unambiguously invoke them.").

The detectives here thoroughly explained the *Miranda* warnings to Thomas. Doing so dispelled the inherent compulsion of the custodial setting and reset Thomas's obligation to invoke his privilege against self-incrimination. Thomas was told—as he had been after his 2012 arrest—that he had "the right to remain silent" and was "not required to say anything to anyone at any time or to answer any questions." He was told he had the right to have a lawyer, paid for by the State, both "before being questioned" and "while being questioned." He was told he could "stop answering questions at any time." Thomas acknowledged both orally and in writing that he understood those rights. So although *Murphy* did not involve a probationer in a custodial setting, its principles extend to a case where the probationer, as here, has been fully advised of his rights. Having received proper *Miranda* warnings and having not been threatened with probation revocation, Thomas was not coerced or compelled to surrender his privilege against self-incrimination.

As a fallback position, Thomas maintained at oral argument that, if we find his *Miranda* waiver voluntary under the traditional totality-of-circumstances test, we should recognize a new exception to the invocation requirement when a probation officer participates with police in a custodial interrogation. Thomas is correct that footnote five in *Murphy* reserves this question. Thomas would have us answer it by requiring the government to provide not only traditional *Miranda* warnings but supplemental warnings that the defendant's probation will not be revoked if he asserts his privilege against self-incrimination. *See also* Thomas Br. 35 ("The *Miranda* warnings . . . were insufficient to combat the coercive use of the probation officer" because "the detectives took no steps to clarify the probation officer's instruction that Mr. Thomas speak with them. The detectives did not cure that taint by informing Mr. Thomas that he would not be violated on probation if he asserted his right to remain silent.").

We decline Thomas's invitation to fashion a new exception to the invocation requirement. Thomas has cited no case in the country that has done so when a probationer in custody has been properly *Mirandized* and the government has not coerced a waiver by threatening to revoke probation. The Supreme Court has also been reluctant to carve out new "exception[s] to the invocation requirement." *Salinas*, 570 U.S. at 186 (plurality opinion). That caution is particularly warranted when, as here, requiring another level of prophylaxis "would needlessly burden the Government's interests in obtaining testimony and prosecuting criminal activity." *Id.*

"*Miranda*'s clarity is one of its strengths . . . ." *Missouri v. Seibert*, 542 U.S. 600, 622 (2004) (Kennedy, J., concurring in the judgment). "*Miranda*'s holding has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible." *Fare v. Michael C.*, 442 U.S. 707, 718 (1979). It is unwise to require additional warnings beyond those set out in *Miranda* when doing so is not needed to avoid or cure a classic-penalty situation. "We share the U.S. Supreme Court's preference for 'bright-line' rules for the guidance of those who must conduct and evaluate custodial interrogations." *Eaton v. Commonwealth*, 240 Va. 236, 253 (1990). So we decline to tack on a codicil to the standard *Miranda* warning when, as here, the government has not expressly or implicitly threatened probation revocation to deter the defendant from invoking his privilege against self-incrimination.

### II. The trial court properly excluded Black's testimony.

Thomas also argues that the trial court erred in excluding the testimony of his mother, Jacqueline Thomas Black, whom the defense proffered would testify that Thomas was vulnerable to suggestion, showing that Thomas had falsely confessed to the crimes against A.R. Thomas claims that excluding Black's testimony denied him his right to present a witness and evidence in

his own defense, in violation of the Sixth and Fourteenth Amendments of the United States Constitution and Article 1, Section 8 of the Virginia Constitution.

Appellate courts "review a trial court's decision to admit or exclude testimony using an abuse of discretion standard." *Jefferson v. Commonwealth*, 298 Va. 1, 10 (2019) (quoting *Commonwealth v. Proffitt*, 292 Va. 626, 634 (2016)). "The exercise of judicial discretion presupposes 'that, for some decisions, conscientious jurists could reach different conclusions based on exactly the same facts—yet still remain entirely reasonable.'" *Barney*, 302 Va. at 94 (quoting *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016)). "This bell-shaped curve of reasonability governing our appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Id.* (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Id.* (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

After defense counsel referred to Thomas as "developmentally delayed" during opening statements, the Commonwealth moved to exclude such evidence for lack of notice under Code § 19.2-271.6. *See generally Shaw v. Commonwealth*, 79 Va. App. 485, 512-20 (2024) (discussing the scope of mental-health evidence admissible under Code § 19.2-271.6 when offered to negate mens rea). The defense responded that it was not offering that evidence to negate mens rea but to explain Thomas's susceptibility to falsely confessing. Based on the proffer, the trial court initially ruled that the evidence was "too speculative."

To consider the issue, however, the court permitted Black to be questioned by defense counsel outside the jury's presence. Black described Thomas's slow development from about the "age of one" to the difficulties he had remembering things into adulthood. Thomas's mother had to lay out his clothes for him. She used "little cards" and a "chart" to remind him to do such things as

brush his teeth, put on deodorant, put on socks, and use soap when showering.  He would forget to get the mail or take out the trash, and when she sarcastically thanked him for completing those chores, he would say, "you're welcome," thinking he had done them.  When Thomas left home to live by himself, his friends would sleep in his house, borrow his things, and eat his food.  Having heard the proffered testimony, the trial court again concluded that it was "too speculative" to undermine the validity of the confession, ruling Black's testimony inadmissible.

A criminal defendant generally "is entitled to present *relevant* and favorable evidence on an element of the offense charged against him."  *Clark v. Arizona*, 548 U.S. 735, 765 (2006) (emphasis added).  "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).  And "the Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or [that] poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane v. Kentucky*, 476 U.S. 683, 689-90 (1986) (second and fourth alterations in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).  In addition, "[r]elevant evidence may . . . be excluded on account of a defendant's failure to comply with procedural requirements," or based on "any number of familiar and unquestionably constitutional evidentiary rules [that] also authorize the exclusion of relevant evidence."  *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (plurality opinion).

"'Relevant evidence' means evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence."  Va. R. Evid. 2:401.  "Evidence that is not relevant is not admissible."  Va. R. Evid. 2:402(a).  "Evidence of collateral facts or those incapable of affording any reasonable presumption or inference on matters in issue, because too remote or irrelevant, cannot be accepted in evidence."  *McMillan v.*

*Commonwealth*, 277 Va. 11, 22 (2009) (quoting *Smith v. Commonwealth*, 223 Va. 721, 723 (1982)). In other words, "evidence that produces only speculative inferences is irrelevant . . . and should be excluded." 29 Am. Jur. 2d *Evidence* § 295 (2019).

For example, in *Hubbard v. Commonwealth*, 243 Va. 1 (1992), the Supreme Court found no abuse of discretion by the trial court in excluding evidence that the driver who died in a collision with the defendant's speeding car had a blood-alcohol level of 0.18. *Id.* at 12. The defendant, who was charged with involuntary manslaughter, offered that evidence to support the possibility that the victim may have crossed into the wrong lane at the time of the fatal collision. *Id.* But because that possibility was only "speculative," the Court found no abuse of discretion in excluding evidence of the victim's "alcohol impairment." *Id.* at 13-14.

We likewise found no abuse of discretion in excluding the defendant's evidence as speculative in *Barnes v. Commonwealth*, 33 Va. App. 619 (2000). The trial court there barred a defense witness from testifying that Barnes "worked five days a week doing manual labor for minimum wage." 33 Va. App. at 624. Barnes argued that the evidence showed that he "was not a drug dealer," since "a drug dealer who was making $600 per day would not engage in minimum wage work." *Id.* We found no abuse of discretion in excluding that testimony because Barnes "neither proffered nor presented evidence of the relationship between minimum wage employment and drug dealing," thus requiring the factfinder "to speculate as to that relationship." *Id.* at 626. Moreover, the time frame when Barnes worked the minimum-wage job ended before the period when he allegedly used an underling to sell drugs. *Id.* So the "proffered testimony" also "concerned facts remote in time." *Id.* at 626-27.

The trial court here likewise did not abuse its discretion in excluding Black's testimony as too speculative to show that Thomas falsely confessed to the crimes against A.R. Black did not describe any instance in which Thomas was encouraged by others to admit to something he did

not do. And the defense presented no connection—no "evidence of the relationship," *id.* at 626—between Thomas's slow development and forgetfulness, on the one hand, and his being prone to falsely confess to police, on the other. The examples offered by Black about Thomas's behavior in his younger years were also "remote in time," *id.* at 627, to his confession in 2019, when Thomas was 35 years old.

At oral argument, defense counsel said the best argument for relevance was Black's description of how Thomas, as an adult, could mistakenly think that he had brought in the mail or taken out the trash after she had sarcastically thanked him for doing so when he hadn't. We disagree with Thomas, however, that "reasonable jurists could not differ," *Grattan*, 278 Va. at 620, in finding that those anecdotes made it more probable than not that Thomas falsely confessed to crimes against A.R.

To the contrary, a reasonable jurist could find that connection too attenuated and remote considering Thomas's videotaped confession. It was Thomas who volunteered A.R.'s name as one of the children he had sexually touched. Thomas also volunteered what he did. He said, "that was more of me touching her," but "that's as far as it went." When asked how many times he touched her, Thomas answered "six, seven" times. When asked how he touched her, Thomas showed the detectives by rubbing his right-index finger around a circle formed by his left thumb and left-index finger, denying that he stuck his finger inside. When told that A.R. had said that Thomas's "private part" had touched "her private part," Thomas said he "believe[d] she's right," but he insisted, "I never penetrated her, I'm telling you that now, I never penetrated her." A reasonable jurist could find—based on Thomas's detailed description of what he remembered and his resistance to any implication that he had "penetrated" A.R.—that it would be entirely speculative to infer from Black's anecdotes about Thomas's chores that Thomas had falsely confessed to the detectives.

We reject Thomas's argument that excluding Black's testimony was reversible error under *Crane*. *Crane* entitled Thomas to "introduce testimony about the physical and psychological environment in which the confession was obtained" to show that his incriminating statements were "unworthy of belief." 476 U.S. at 684. But Black's testimony did not address the custodial setting or Thomas's confession.

Nor did the trial court's ruling violate *Pritchett v. Commonwealth*, 263 Va. 182 (2002), where the trial court erred by disallowing the testimony of two "experts in the field of psychology." *Id.* at 185. Their testimony directly addressed the risk of false confessions and was admissible under *Crane* "to assist the jury in determining whether the confession was reliable." *Id.* at 186. One expert, a clinical neuropsychologist, testified that her testing showed that Pritchett had an IQ of 69 and was intellectually disabled. *Id.* at 185. The other, a forensic psychologist, testified that such low IQs correlate with a tendency to "go along with [authority] figures" and with "leading questions." *Id.* (alteration in original). That expert had also tested Pritchett to confirm his willingness to agree with the questioner. *Id.* at 185-86. Black, by contrast, was not a mental-health expert and provided only anecdotal evidence that required rank speculation to connect it to the possibility of a false confession.

In short, the trial court did not abuse its discretion in excluding Black's testimony.

### *III. The trial court did not abuse its sentencing discretion.*

Lastly, we reject Thomas's claim that the trial court abused its sentencing discretion and erred in its decision to impose life sentences for the two rape and two animate-object-penetration convictions. "Such decisions—if within the lawful boundaries of applicable sentencing statutes and constitutional limitations—are vested in the sound discretion of trial judges, not appellate judges." *Minh Duy Du*, 292 Va. at 563. So "when a statute prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum, the sentence will not be overturned as

being an abuse of discretion." *Id.* at 564 (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007)); *Cellucci v. Commonwealth*, 77 Va. App. 36, 48 (2023) (en banc) (same).  There is no dispute here that the sentence imposed fell within the range set by the legislature, including the life sentences for the rape and animate-object-penetration convictions.  *See* Code §§ 18.2-61(A)(iii), (B), 18.2-67.2(A)(1), (B).  "[O]nce it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end." *Minh Duy Du*, 292 Va. at 565 (quoting *Dorszynski v. United States*, 418 U.S. 424, 431 (1974)); *see, e.g.*, *Taylor v. Commonwealth*, 77 Va. App. 149, 176-77 (2023) (finding no abuse of discretion in imposing statutory maximum).  Thus, a claim that a "life sentence" is "excessive" when the statute allows a life sentence will "necessarily fail," *Minh Duy Du*, 292 Va. at 565, barring some other statutory or constitutional basis for the challenge.

Noting that his life sentence here is "substantially above the high end of the sentencing guidelines," Thomas argues that the trial court abused its sentencing discretion because it "did not consider the mitigating evidence," including his intellectual disability and his being the victim of sexual assault himself.  Thomas Br. 41, 45.  Thomas infers that the court ignored mitigating evidence because it mentioned only the depravity of Thomas's crimes and "did not mention any mitigation evidence, including the sentencing memorandum, letters, and argument of counsel."  Thomas Br. 42-44.  Thomas argues that since he had been "successful on probation," with "no evidence . . . [of] any new offenses while in the community," no "reasonable person" could have found "that a life sentence was merited."  Thomas Br. 45.

Not one of those claims has merit.  The trial court's failure to follow the sentencing guidelines is "not . . . reviewable on appeal."  Code § 19.2-298.01(F).  The guidelines themselves "are discretionary and are not binding on the circuit court's determination of the appropriate sentence."  *Woodard v. Commonwealth*, 287 Va. 276, 282 (2014).  We presume that

the trial court considered mitigating circumstances, "absent clear evidence to the contrary," and "[n]othing in the record here indicates that the trial court failed to consider the . . . mitigating circumstances." *Cellucci*, 77 Va. App. at 49-50. To the contrary, Thomas overlooks the trial court's explicit statement that it "has considered all of the things that are presented by both sides." Appellate courts also reject arguments that "the mitigating evidence was of such weight that the court could not have considered it and still sentenced" the defendant as it did. *Reid v. Commonwealth*, 256 Va. 561, 569 (1998). As *Reid* explained, although "the fact-finder has a duty to consider mitigating evidence along with other evidence in determining the appropriate sentence[,] . . . the fact-finder is 'not required to give controlling effect to the mitigating evidence.'" *Id.* (quoting *Correll v. Commonwealth*, 232 Va. 454, 468-69 (1987)).

"Criminal sentencing decisions are among the most difficult judgment calls trial judges face." *Minh Duy Du*, 292 Va. at 563. "Because this task is so difficult, [appellate courts] must rest heavily on judges closest to the facts of the case—those hearing and seeing the witnesses, taking into account their verbal and nonverbal communication, and placing all of it in the context of the entire case." *Id.* Our Supreme Court has also emphasized the "'elevated public safety concerns with "the crime of child molestation," which all too often goes unreported.'" *Id.* at 565 n.6 (quoting *Murry v. Commonwealth*, 288 Va. 117, 127 (2014)). Given all these considerations, we cannot second-guess the trial court's considered judgment that Thomas is "a serial pedophile" and that the court had "no way of protecting the community from [Thomas] other than to impose a life sentence."

CONCLUSION

We find no basis to disturb Thomas's convictions for his crimes against A.R. (FE-2021-37), C.R. (FE-2020-515), or T.W. (FE-2021-38). Accordingly, the judgment below is affirmed.

*Affirmed*.

Causey, J., with whom Chaney, J. joins, dissenting.[17]

In their thorough analysis of the limitations of an individual's Fifth Amendment rights, the majority concludes that the circuit court properly declined to suppress Thomas's statements to the police because Thomas voluntarily waived his *Miranda* rights. But the majority opinion misses the forest for the trees. Assessing the voluntariness of a defendant's waiver of his *Miranda* rights requires a broad view of all the circumstances, not an evaluation of each factor in isolation. When viewed through the lens of a totality of the circumstances analysis—prescribed by precedent—Thomas did not make a voluntary waiver of *Miranda*. Thus, the circuit court erred by not suppressing his incriminating statements. We respectfully dissent and would reverse and remand the case for further proceedings.

Elwood Lewis Thomas is a resident of Fairfax County with a history of mental health disorders and intellectual disabilities. Thomas was placed on probation following his 2012 arrest and subsequent conviction for aggravated sexual battery. Thomas was compliant with all aspects of his probation. Thomas understood, acknowledged, agreed to, and signed the rules and conditions of his probation, including "Condition 6," that he "report to his probation officer, be truthful, cooperative," and that he follow his probation officer's instructions. While on probation, Thomas was under the supervision of Joseph Samluk of the Fairfax Adult Probation office for roughly six or seven years. Thomas's probation required him to disclose essentially all aspects of his life to Samluk. Samluk had what would be fair to describe as a good relationship with Thomas; Samluk said that they had a "good rapport" and that Thomas was "honest with [him] about everything."

---

[17] Because we find that the circuit court erred in admitting Thomas's confession, we do not reach the question of the admissibility of Thomas's mother's statement, nor the question of Thomas's sentence.

Thomas's probation terms also required him to follow his probation officer's instructions. Under the law applicable at the time, failing to follow his probation officer's instructions would have risked reinstating his sentence.[18] Thomas understood that he was duty bound to be completely forthcoming, honest, and follow every instruction Samluk gave. Observing this trust, positive relationship, and understanding of obligation demonstrated in the record, it is all the more troubling that Thomas's trust and vulnerability were used against him on the day police questioned him regarding the case at bar.

In September 2019, Fairfax County police officers coordinated with Samluk to arrest Thomas at Samluk's office. Samluk called Thomas down to his office, and when Thomas arrived, four officers arrested him, searched him, and transported him to police headquarters. The officers requested that Samluk join them at the police station, so Samluk made the thirty-to-forty-five-minute drive separately and met them at the station. Samluk then entered the interrogation room, where two police officers sat across from Thomas, who had one hand handcuffed. The officers then asked Samluk to introduce them to Thomas. Samluk introduced the police officers to Thomas by name. Samluk then said, "They need to talk to you about some things." Then, Samluk—with knowledge of Thomas's disability and the nature of their relationship requiring full compliance with all his instructions—instructed Thomas to "go ahead and chat with them today," to which Thomas responded, "Yeah." The circuit court found that this was an *instruction* from Thomas's probation officer.[19] The instruction was to "chat" with the

---

[18] The interrogation predated the enactment of Code § 19.2-306.1. Accordingly, the circuit court could have revoked the entirety of Thomas's suspended sentence for any probation violation. *See* Code § 19.2-306(A) (2019); 2021 Va. Acts Spec. Sess. I ch. 538.

[19] The majority focuses on the circuit court's finding that the instruction was not "'or else' in so many words, or using the power of probation." *Ante* at 18. If understood as a finding about the probation officer's subjective intent, this finding should receive little consideration in the totality-of-the-circumstances analysis. On the other hand, if understood as a finding that it would

police who had just arrested Thomas and now sought to interrogate him regarding the charges for which he had been arrested. To that point, Thomas had always followed Samluk's instructions and would have had no reason to believe that his duty as a probationer to "follow his probation officer's instructions" did not apply to the instruction to speak with the police, which was made in the context of additional authority and pressure to comply with requests inherent to a custodial interrogation. Armed with full knowledge of Thomas's probation conditions and intellectual disabilities, the police officers made no effort to counteract the enhanced coerciveness of the circumstances. The officers never informed Thomas that Samluk's instruction did not affect his constitutional rights. The circuit court found that Samluk had placed himself "in an unusual situation" by going to the police station, which was "not the best idea." But the circuit court found that Thomas's waiver of his rights was voluntary.

I. Background Law on Involuntary Waiver

In the "inherently coercive" circumstances of a custodial interrogation, the Fifth-Amendment privilege becomes "self-executing." *Minnesota v. Murphy*, 465 U.S. 420, 429-30 (1984). In a custodial interrogation, there are "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). Such pressures include the "substantial risk that the police will inadvertently traverse the fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion." *Moran v. Burbine*, 475 U.S. 412, 426 (1986). These pressures are so significant that even without an affirmative invocation of the privilege, incriminating statements made during custodial interrogation are

---

not have been natural for Thomas to understand the instruction as mandatory, it is plainly wrong because it cannot be reconciled with the plain language of Samluk's statement, the court's finding that these words were an "instruction," the unrebutted testimony on Thomas's terms of probation requiring that instructions be followed, and the increased coerciveness inherent to a custodial interrogation.

"presumed" to have been compelled unless sufficient safeguards are employed to overcome the presumption. *Garner v. United States*, 424 U.S. 648, 657 (1976) ("It is presumed that without proper safeguards the circumstances of custodial interrogation deny an individual the ability freely to choose to remain silent.").

Because of these inherent risks, the Supreme Court of the United States has established a procedural hurdle that the police must surmount in every custodial interrogation: the reading of *Miranda* rights. *Thomas v. Commonwealth*, 72 Va. App. 560, 574 (2020) (citing *Miranda*, 384 U.S. at 479). The relevant constitutional inquiry, however, is not simply whether *Miranda* warnings have been communicated, but whether, under the totality of the circumstances, the subject of the custodial interrogation "voluntarily, knowingly, and intelligently" waived those rights. *Tirado v. Commonwealth*, 296 Va. 15, 28 (2018) (citing *Moran*, 475 U.S. at 421); *Medley v. Commonwealth*, 44 Va. App. 19, 24 (2004); *Rodriguez v. Commonwealth*, 40 Va. App. 144, 155 (2003); *J. D. B. v. North Carolina*, 564 U.S. 261, 269-70 (2011) (explaining that even if *Miranda* warnings have been provided, the government bears the burden of showing that the suspect "voluntarily, knowingly and intelligently waived those rights" (quoting *Miranda*, 384 U.S. at 475-76)); *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017). Here, Thomas was undoubtedly subject to a custodial interrogation. The question presented by this case is whether his waiver, under all the circumstances, was voluntary.

Under settled precedent, we assess the voluntariness of a suspect's waiver of his *Miranda* rights—in the context of custodial interrogations—by examining "the totality of the circumstances," including "the defendant's age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview." *Tirado*, 296 Va. at 28 ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather

than intimidation, coercion, or deception. . . . Only if the *totality of the circumstances surrounding the interrogation* reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived (emphasis added) (quoting *Moran*, 475 U.S. at 421)); *Thomas*, 72 Va. App. at 582 (listing factors to consider per totality of the circumstances) (quoting *Keepers v. Commonwealth*, 72 Va. App. 17, 37 (2020)); *Jackson v. Commonwealth*, 267 Va. 178, 190 (2004) ("When determining whether a defendant's statement was voluntarily given, we examine the totality of the circumstances, which include the defendant's background and experience as well as the conduct of the police in obtaining the waiver of *Miranda* rights and confession."); *Midkiff v. Commonwealth*, 250 Va. 262, 268 (1995) (same); *Rodriguez*, 40 Va. App. at 157; *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (collecting cases and explaining that determining voluntariness requires "a careful scrutiny of all the surrounding circumstances"). Across the country, appellate courts have reversed convictions pursuant to totality-of-the-circumstances voluntariness analyses when the circumstances surrounding an interrogation were marred by combinations of factors including intellectual disability and coercive police tactics. *See United States v. Preston*, 751 F.3d 1008, 1023 (9th Cir. 2014) (considering intellectual disability and coercive police tactics among the "totality of the circumstances" to reverse a trial court's finding that a confession given in a noncustodial context was voluntary); *Giddins*, 858 F.3d at 876-78, 885 (reversing trial court after finding police deception so coercive that despite defendant's familiarity with the criminal justice system, under the "totality of the circumstances," defendant's "waiver and statements were involuntary"); *United States v. Lall*, 607 F.3d 1277, 1284 (11th Cir. 2010) (reversing conviction due to involuntary waiver because of officer's suggestion that he would not pursue charges, combined with "totality of the circumstances" including isolation of suspect during interrogation and other misleading statements); *In re S.W.*,

124 A.3d 89, 102-05 (D.C. 2015) (reversing trial court where, under the "totality of the circumstances," police's coercive statements and suspect's juvenile status rendered *Miranda* waiver involuntary).

II. Under the totality of the circumstances, Thomas did not voluntarily waive his Fifth Amendment rights.

When conducting our independent appellate review, we apply a well-established test for voluntariness by asking whether Thomas's *Miranda* waiver, under the totality of the circumstances, was "the product of an essentially free and unconstrained choice by its maker, or whether the maker's will has been overborne and his capacity for self-determination critically impaired." *Tirado*, 296 Va. at 28 (citing *Gray v. Commonwealth*, 233 Va. 313, 324 (1987)); *see also Schneckloth*, 412 U.S. at 225 ("The ultimate test remains . . . . Is the [waiver] the product of an essentially free and unconstrained choice by its maker?" (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961))); *Jackson*, 267 Va. at 190 (same); *Swann v. Commonwealth*, 247 Va. 222, 231 (1994) (same); *Jenkins v. Commonwealth*, 244 Va. 445, 453 (1992) (same). "If the suspect's will has been overborne and his capacity for self-determination critically impaired, the confession is considered involuntary and its use is unconstitutional." *Avent v. Commonwealth*, 279 Va. 175, 195 (2010) (quoting *Midkiff*, 250 Va. at 268).

A. Standard of Review

The voluntariness of Thomas's waiver should be reviewed de novo. *Ayala v. Commonwealth*, 79 Va. App. 41, 50 (2023); *Tirado*, 296 Va. at 27-28. The majority suggests that a deferential standard of review should apply. We disagree, holding to our binding precedent. In our recent *Ayala* decision, we stated that whether a waiver of *Miranda* was voluntary is a legal question. *Ayala*, 79 Va. App. at 50. The question of whether the waiver was knowing and intelligent, on the other hand, is a question of fact. *Id.* We reached this conclusion in *Ayala* by relying on *Tirado*, which laid the rule out in its entirety: "'[W]hether the waiver was made

- 40 -

knowingly and intelligently is a question of fact,' and the circuit court's determination on this issue 'will not be set aside on appeal unless plainly wrong.' On the other hand, whether a statement was voluntary is a 'legal rather than factual question.'" *Tirado*, 296 Va. at 27-28 (first quoting *Angel v. Commonwealth*, 281 Va. 248, 258 (2011); and then quoting *Gray*, 233 Va. at 324).

The majority states that *Ayala*'s statement of the rule regarding voluntary waiver should be overruled because (1) *Tirado*'s use of the word "statement" indicates that it should be confined to the line of cases applicable to coerced *statements* as distinct from waivers, and because (2) *Ayala*'s interpretation of *Tirado* conflicts with the 1992 *Harrison v. Commonwealth*, 244 Va. 576 (1992), case and a 2020 decision by this Court in *Keepers*. We disagree with both arguments.

### 1. *Tirado*

The standard of review provided in *Tirado* governs the *Miranda* waiver voluntariness analysis. A review of the rest of the paragraph in which the rule is stated makes this clear. After it states the standards of review for knowing and intelligent "waiver" and for voluntary "statements," (as quoted above) the Court immediately turns to a unified discussion of the concepts of *voluntary, knowing, and intelligent waiver* that spans two paragraphs. *Tirado*, 296 Va. at 27-28 ("Thus, whether a waiver of *Miranda* was 'made voluntarily, knowingly, and intelligently' has two components."). In this context, the discussion of the standard of review applicable to the question of "voluntary statement" should not be understood as a brief, random sidebar on an irrelevant topic, but instead can be understood as providing the standard of review for one of the central focuses of the ensuing paragraphs: voluntary waiver.

Furthermore, *Tirado* posed no voluntary statement question separate from the issue of voluntary waiver. *Id.* (citing the defendant's argument that, "the Court of Appeals erred in

upholding the circuit court's finding that his *Miranda* waiver was *knowing and voluntary*" and resolving the voluntariness argument by finding that, "[r]egarding voluntariness, in the present case there is no evidence or assertion that Tirado's *waiver of Miranda* was the product of 'intimidation, coercion, or deception'" (emphases added)).  Thus, for a second reason, *Tirado*'s provision of the standard of review for the voluntariness of a "statement" only makes sense if understood to refer to the voluntariness of a *Miranda* waiver.

Finally, it is unnecessary for our purposes to establish the exact meaning of the standard of review stated in *Gray*, which *Tirado* cites.  But because the majority does discuss *Gray*, citing to *Tirado*'s reliance on *Gray* as partial support for its conclusion about the meaning of *Tirado*, we note that the import of *Gray*'s use of the term "statement" was itself ambiguous—in fact, much of the *Gray* Court's discussion centered on a defendant's choice to sign a *Miranda* form; its analysis of the coercion allegedly brought to bear against the defendant is hard to distinguish from the question of voluntary waiver.  *Gray*, 233 Va. at 324-25.  In *Tirado*, the Court clearly intended to state a rule applicable to the voluntary waiver question and did in fact apply it in such a context, so it was not error for us to recognize this rule as such in *Ayala*.

2. *Harrison* and *Keepers*

The majority is also incorrect that *Ayala*'s interpretation of *Tirado* conflicts with our 2020 holding in *Keepers* and the 1992 Virginia Supreme Court case, *Harrison*.  Neither *Harrison* nor *Keepers* discuss the standard applicable to voluntary waiver; each addressed only knowing and intelligent waiver.  *See Keepers*, 72 Va. App. at 37; *Harrison*, 244 Va. at 581.  In *Harrison*, on which the majority places particular emphasis, the Court applied a deferential standard to the questions of knowing and intelligent waiver but treated the defendant's apparent voluntary-waiver argument as a voluntary-*confession* argument, assessing it de novo.  *Harrison*, 244 Va. at 581, 583 (stating that "[u]nlike the *voluntariness* inquiry relevant to the admissibility

- 42 -

of a *confession* where the question is one of law . . . the inquiry whether a waiver of *Miranda* rights was *made knowingly and intelligently* is a question of fact" and finding that the defendant made a "knowing and intelligent waiver" and that "the *confession* was *voluntary* and properly admitted" (emphases added)).  Thus, *Tirado* did not need to "silently overrule" *Harrison*; the cases are consistent.  And *Ayala*'s interpretation of *Tirado* did not conflict with *Keepers*.  *See Keepers*, 72 Va. App. at 37 ("A person may waive his rights under *Miranda* 'if the waiver is made *knowingly and intelligently*.' . . .  This decision is a question of fact." (emphasis added)).

Under binding precedent, our review is de novo.  However, even under the majority's deferential standard, the circuit court clearly erred by failing to find that Thomas's waiver was involuntary, under the totality of the circumstances.

B.  The Probation Officer's Instruction

Thomas was arrested at the office of his probation officer, who coordinated his arrest with the police.  He was handcuffed, transported to the police station, and taken into the interrogation room.  Thomas's probation officer then entered the interrogation room, having driven to police headquarters at the police's request.  The police asked the probation officer to introduce them; Thomas's probation officer then instructed Thomas to "chat with" the police "today," and left the room.  Subjectively, Thomas knew he was required to follow the direction of his probation officer as part of his probation.  A natural understanding for Thomas, based on the literal meaning of Samluk's words, would have been that he was required to talk to the detectives "today."[20]  Additionally, Thomas, who had been described as "mentally retarded" or

---

[20] The majority states that if Thomas believed that his probation officer's instruction affected his ability to exercise his Fifth Amendment privilege, this belief "would not have been reasonable because the Supreme Court has 'made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege.'"  *Ante* at 25 (citing *Murphy*, 465 U.S. at 438).  There is no reason to believe that Thomas was familiar with Supreme Court precedent on custodial interrogation and its

"intellectually disabled" in police reports, possessed intellectual limitations that placed him in a poor position to resist the coercion applied here. Samluk's instruction, in the context of Thomas's understanding of his obligations, his relationship with Samluk, his intellectual limitations, and the coerciveness inherent in any custodial interrogation, presented an extremely high risk that any subsequent waiver that Thomas made would not be "an essentially free and unconstrained choice," but rather resulted from a situation in which Thomas's will was "overborne and his capacity for self-determination critically impaired." *Tirado*, 296 Va. at 28 (citing *Gray*, 233 Va. at 324). These circumstances are manifestly relevant to the totality-of-the-circumstances assessment of the waiver's voluntariness. *See id.*; *Thomas*, 72 Va. App. at 582; *Preston*, 751 F.3d at 1023.

A person's choice to waive their *Miranda* rights is not free and unconstrained if it is the product of intimidation, coercion, or deception by the police. *Tirado*, 296 Va. at 28. "Evidence of coercive police activity 'is a necessary predicate to the finding that a [*Miranda* waiver] is not "voluntary."'" *Washington v. Commonwealth*, 43 Va. App. 291, 303 (2004) (quoting *Commonwealth v. Peterson*, 15 Va. App. 486, 488 (1992)). Coercive activity may include "the interrogation techniques employed, including evidence of trickery and deceit, psychological pressure, threats or promises of leniency, and duration and circumstances of the interrogation." *Id.* (quoting *Terrell v. Commonwealth*, 12 Va. App. 285, 291 (1991)). "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda*, 384 U.S. at 476. The psychological pressure need not be overt or explicit to affect a defendant's will. *United States v. Tingle*, 658 F.2d 1332,

---

intersection with probationers' rights. There is, however, reason to believe that he was intimately familiar with the terms of his probation, which he had adhered to by obeying his officer's instructions and answering his questions regarding extremely private matters for more than five years.

- 44 -

1335 (9th Cir. 1981) ("Subtle psychological coercion suffices . . . and at times [may be] more effective[], to overbear 'a rational intellect and a free will.'").  Here, the police officers' request that Samluk introduce them, made while Thomas was in custody, combined with the subsequent instruction by the probation officer to "chat" with them clearly would have had a coercive effect on Thomas—especially considering his intellectual disability—whether or not categorized as "subtle." *Id.*  The effect of this coercion is another aspect of the totality of the circumstances indicating that Thomas's waiver was not voluntary.[21]  *See Tirado*, 296 Va. at 28; *Thomas*, 72 Va. App. at 582.

The circuit court pointed out that the effect of a probation officer's instruction to answer in a custodial interrogation was a matter of first impression.  The appropriate way to analyze the coerciveness of the instruction is as a part of the totality-of-the-circumstances analysis required to assess a waiver's voluntariness—not in terms of whether it would render the waiver *automatically* involuntary, divorced from context.  *See Tirado*, 296 Va. at 28; *Thomas*, 72 Va. App. at 582.  Other courts have found terms of probation requiring the choice between compliance with instructions or assertion of Fifth Amendment rights to be unduly coercive.  *See United States v. Saechao*, 418 F.3d 1073, 1079 (9th Cir. 2005) ("The Fifth Amendment proscribes the use in a separate criminal proceeding of a statement obtained pursuant to a probation condition that requires a probationer to 'choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent.'" (quoting *Murphy*, 465 U.S. at 436)); *People v. Garcia*, 391 P.3d 1153, 1156 (Cal. 2017) (holding that, because a

---

[21] The majority emphasizes that the detectives did not overtly *threaten* Thomas.  *Ante* at 18.  But subtle psychological coercion—not only explicit *threats*—can impose significant pressure on a defendant.  *See Tingle*, 658 F.2d at 1335.  And unlike in some "classic penalty" cases, which can be noncustodial, custodial interrogations come with a presumption of coerciveness.  *Garner*, 424 U.S. at 657.  Thus, the lack of a stated threat does not excuse us from performing a totality of the circumstances analysis that interrogates the cumulative effects of the various pressures placed on Thomas.  *See Tirado*, 296 Va. at 28; *Thomas*, 72 Va. App. at 582.

probation condition compelled the defendant's statements, those statements could not "lawfully be used against him in a criminal proceeding"); *State v. Eccles*, 877 P.2d 799, 801 (Ariz. 1994) (en banc) (holding that a probation condition that requires a defendant to waive his Fifth Amendment rights is unconstitutional). These cases provide additional support for the finding that Samluk's instruction to Thomas, which Thomas could have naturally understood to mean that he was required to choose between compliance and his Fifth Amendment rights, created an inappropriate level of coercion to be considered among the totality of the circumstances.

Thomas's intellectual disability only increased the potential for Samluk's instruction and the surrounding circumstances to overbear Thomas's will. Again, Thomas was described as "intellectually disabled" and "mentally retarded" in police reports, as the police officers who interrogated Thomas knew. As we have said, "the degree of pressure necessary to crush one's will varies with the individual." *Robinson v. Commonwealth*, 63 Va. App. 302, 311 (2014) (quoting *Hill v. Commonwealth*, 52 Va. App. 313, 319 (2008)). A person "of normal intelligence . . . is more resistant to interrogation than a person who is very young, uneducated or weak-minded." *Miller v. Fenton*, 796 F.2d 598, 606 (3d Cir. 1986). "It simply 'takes less' in terms of sophisticated police interrogation techniques 'to interfere with the deliberative processes of one whose capacity for rational choice is limited than it takes to affect the deliberative processes of one whose capacity is not so limited.'" *Preston*, 751 F.3d at 1023 (quoting *Smith v. Duckworth*, 910 F.2d 1492, 1497 (7th Cir. 1990)). *Compare id.* (considering defendant's "reduced mental capacity" as among the circumstances rendering his confession involuntary); *Thomas v. North Carolina*, 447 F.2d 1320, 1322 (4th Cir. 1971) (finding a confession involuntary in part because of the defendant's "low mentality" and "limited education"), *with Avent*, 279 Va. at 196 (finding the defendant's *Miranda* waiver voluntary in part because the defendant was "a man of at least average intelligence"); *Jackson*, 267 Va. at 190 ("The court also noted that the defendant had a

reported IQ score of 100 and an educational level sufficient to read and write."); *Roach v. Commonwealth*, 251 Va. 324, 341 (1996) ("The record shows that Roach was of average intelligence, and that he telephoned Sheriff Morris to initiate the questioning."); *Swann*, 247 Va. at 231 ("Swann, a high school graduate who had attended one semester of college, was no stranger to the judicial system."). Moreover, a suspect who "suffers from mental disabilities and deficiencies" is "less likely to clearly invoke his right to counsel or to remain silent," is "more likely to 'parrot' back the details the officers suggested, whether or not they [are] true," and is "more likely to place stock in any promises or threats that the officers made, however ambiguous they might be." *State v. Rettenberger*, 984 P.2d 1009, 1017 (Utah 1999). That Thomas had an intellectual disability is another factor showing the coerciveness of the situation he faced, to be considered along with the effects of the probation officer's instruction, among the totality of the circumstances. *See Tirado*, 296 Va. at 28; *Thomas*, 72 Va. App. at 582; *Preston*, 751 F.3d at 1023.

C. The Recitation of the *Miranda* Warnings

The recitation of *Miranda* warnings does not in itself suffice to show that, under the totality of the circumstances, a defendant's subsequent waiver of his rights was voluntary.[22] *Cf. Missouri v. Seibert*, 542 U.S. 600, 611 (2004) ("[I]t would be absurd to think that mere recitation

[22] The majority suggests that as long as officers have recited *Miranda* warnings to a suspect in a custodial interrogation and the police issue no threats, this is sufficient to overcome the presumption of coerciveness present in any custodial interrogation. *Ante* at 26. The majority therefore analyzes Thomas's arguments regarding the effects of his probation officer's instruction as an argument to "fashion a new exception to the invocation requirement." *Ante* at 27. This position ignores the necessity of performing a totality-of-the-circumstances assessment of voluntariness. The effects of the probation officer's instruction on Thomas's will are to be assessed in terms of their effects on Thomas's capacity for free choice, in the context of and in combination with the other relevant circumstances, including deficiencies in the reading of *Miranda* rights. *Tirado*, 296 Va. at 28; *Bustamonte*, 412 U.S. at 225. Contrary to the majority's argument, this assessment requires following settled precedent, not fashioning a new exception. Additionally, at oral argument, defense counsel repeatedly stated that he was not arguing for a new exception.

of the litany suffices to satisfy *Miranda* in every conceivable circumstance."). If the surrounding circumstances show that the *Miranda* warnings were ineffective to safeguard the privilege, the resulting *Miranda* waiver is not voluntary. *Id.* "[U]nless the warnings could place a suspect" in a position to make a *genuinely informed* choice, "there is no practical justification for accepting the formal warnings as compliance with *Miranda*." *Id.* at 612. Indeed, a "confession, even if obtained in full compliance with *Miranda*, may be inadmissible if it was not voluntary." *Kauffman v. Commonwealth*, 8 Va. App. 400, 405 (1989); *see Rodriguez*, 40 Va. App. at 155; *S.W.*, 124 A.3d at 105.

In this case, for Thomas's waiver to have been voluntary, the police were required to employ adequate safeguards to overcome circumstances in which an enormous level of coerciveness had been brought to bear—because they were performing a custodial interrogation of a person with an intellectual disability, whose probation officer had just specifically instructed him to speak with them. *See Garner*, 424 U.S. at 657 ("It is presumed that without proper safeguards the circumstances of custodial interrogation deny an individual the ability freely to choose to remain silent."); *Robinson*, 63 Va. App. at 311 ("[T]he degree of pressure necessary to crush one's will varies with the individual."); *Garcia*, 391 P.3d at 1156 (holding that, because a probation condition compelled the defendant's statements, those statements could not "lawfully be used against him in a criminal proceeding"). Faced with this burden, the police *not only* failed to take additional safeguards by telling Thomas that the instruction was non-binding, but conducted themselves in a manner that made the *Miranda* warnings less effective at conveying rights than they ordinarily would be.

A police officer handed Thomas his *Miranda* consent form but then explained it away by stating, "we're the government, and the government loves our forms." The officer also told Thomas, "I know you're going to have questions about everything, and I'm happy to talk about

that stuff with you, but we just have to do this first." *See People v. Smiley*, 530 P.3d 639, 649 (Colo. 2023) (*Miranda* warnings may be ineffective when the officers "downplay[] the importance of the advisement and the rights contained therein," and "impl[y] that the advisement [is] a mere formality"); *People v. Honeycutt*, 570 P.2d 1050, 1054-55 (Cal. 1977) (when an officer has a lengthy prewarning conversation with a suspect that "soften[s]-up" that suspect to waive his rights before the officer formally advises him of those rights, the formal advisement is ineffective).[23] The forms were read to Thomas, and while the officers paused intermittently while reading the *Miranda* warnings and the bulk of the form, they read the form's final lines (about agreeing to speak to investigators without a lawyer present, knowing his rights, and not having been made promises or threatened) quickly and without pauses to give Thomas an opportunity to ask questions or confirm he understood the information, despite knowing of Thomas's intellectual limitations. *See Preston*, 751 F.3d at 1023 ("It simply 'takes less' in terms of sophisticated police interrogation techniques 'to interfere with the deliberative processes of one whose capacity for rational choice is limited than it takes to affect the deliberative processes of one whose capacity is not so limited.'" (quoting *Duckworth*, 910 F.2d at 1497)). Perhaps most crucially, the officers took no steps to counteract the coercive effect of the prewarning instruction to "chat" with the officers—the clear implication of which would have been that when asked whether he wanted to speak with the officers, Thomas should agree. They never stated that

---

[23] The majority appears to emphasize that an officer's downplaying the importance of a *Miranda* warning is not, *in itself*, enough to render a *Miranda* warning insufficient. This is not the pertinent legal issue. Rather, the question is whether the downplaying of the warning, in combination with the totality of the circumstances surrounding Thomas's waiver (including the probation officer's instruction, Thomas's legal obligations, the relationship between Thomas and Samluk, and Thomas's intellectual disability) on the whole show that Thomas's waiver of his rights was not voluntary. *See Tirado*, 296 Va. at 28; *Thomas*, 72 Va. App. at 582. If the downplaying that occurred made it less likely that Thomas's waiver was genuinely informed and voluntary, then it is a relevant circumstance to consider. *See Seibert*, 542 U.S. at 611. Clearly the majority agrees that the officer downplayed the *Miranda* warning.

Thomas did not have to follow his probation officer's instruction. Instead, the investigators finished up by telling Thomas that while he did not have to sign the forms, it would help the investigators if he did—and so he did.

D. The law and evidence in their totality demonstrate that Thomas's waiver was involuntary.

The totality of the circumstances compels the conclusion that Thomas's waiver of his rights was involuntary. It would have been entirely natural for Thomas to believe that when his probation officer instructed him, during a custodial interrogation, to "chat" with the police officers who had arrested him "today," he was not permitted to ignore that instruction. Thomas was legally required to comply with all of his probation officer's instructions and had dutifully followed them for over five years. The fact that he was intellectually disabled further diminished the amount of pressure necessary to overbear his will. And when the police officers failed to intervene in any way, making no statement about the legal inefficacy of the preceding instruction *and* downplaying the *Miranda* warnings' importance as they gave them, they failed to resuscitate a situation that had already spiraled beyond constitutional limits. Upon "careful scrutiny of all the surrounding circumstances," *Bustamonte*, 412 U.S. at 226, it is clear that Thomas's waiver was not "the product of an essentially free and unconstrained choice by its maker," *Tirado*, 296 Va. at 28 (quoting *Gray*, 233 Va. at 324).

Additionally, the error in admitting Thomas's incriminating statements was not harmless. When analyzing constitutional harmless error, we ask whether it is "clear beyond a reasonable doubt that a rational [factfinder] would have found the defendant guilty absent the error." *Commonwealth v. White*, 293 Va. 411, 422 (2017) (alteration in original) (quoting *Neder v. United States*, 527 U.S. 1, 17 (1999)). "A confession is like no other evidence." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). Incriminating statements, "deliberately made, precisely identified and clearly proved afford[] evidence of a most satisfactory nature and may furnish the

strongest and most convincing evidence of truth." *Prince v. Commonwealth*, 228 Va. 610, 613 (1985). Here, Thomas's incriminating statements were powerful evidence, without which the Commonwealth's case rested primarily on A.R.'s testimony. A fact finder should assess A.R.'s credibility without the improperly admitted statements.

III. The Majority Decision

In our view, the majority's decision errs in three important ways: by failing to consider the totality of the circumstances when assessing voluntariness; by according undue weight to a finding about the probation officer and police's subjective intent; and by mistakenly relying on precedent governing the noncustodial interrogation context.

In assessing the voluntariness of a defendant's waiver of his *Miranda* rights, a court is required to consider the "totality of the circumstances," including "the defendant's age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview." *Thomas*, 72 Va. App. at 582 (quoting *Keepers*, 72 Va. App. at 37); *Jackson*, 267 Va. at 190. Instead, the majority in this case conducts an impermissible "divide-and-conquer analysis," assessing the relevance of each circumstance affecting Thomas's freedom of choice in isolation from the other factors. *See Shifflett v. Commonwealth*, 58 Va. App. 732, 740 (2011) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). Thus, the circumstances' cumulative effect on Thomas's will goes unconsidered.

For example, when the majority assesses the effects of Thomas's intellectual disabilities, it cites precedent that a defendant's mental condition "*by itself and apart from* its relation to official coercion' can never '*dispose of* the inquiry into constitutional voluntariness.'" *Ante* at 20 (emphases added). When the majority turns to the effect of the probation officer's instruction on Thomas's will, intellectual disability is completely ignored. Likewise, the precedent that the

majority cites as if it were dispositive (and quotes, at length) is about the insufficiency of the pressures of probation to transform a *non*-custodial questioning into a custodial interrogation. *Ante* at 23-24. And when the majority analyzes the officers' choice to downplay the significance of the *Miranda* warnings, the facts and law are, again, presented as if there were no reason to believe that in this case, the events leading up to the *Miranda* warning made it especially important for *these* officers to ensure that Thomas was genuinely informed of his rights. *Ante* at 21-22. In neglecting to assess the totality of the circumstances, the majority misses the forest for the trees in a way that contravenes precedent. *Jackson*, 267 Va. at 190; *Tirado*, 296 Va. at 28; *Thomas*, 72 Va. App. at 582; *Keepers*, 72 Va. App. at 37; *Medley*, 44 Va. App. at 24; *Preston*, 751 F.3d at 1023; *Giddins*, 858 F.3d at 885; *Lall*, 607 F.3d at 1284; *S.W.*, 124 A.3d at 102-05. *See also State v. Baker*, 465 P.3d 860, 870 (Haw. 2020) ("Crucially, a court must not analyze the individual circumstances in isolation, but must weigh those circumstances in their totality."); *State v. Fernandez-Torres*, 337 P.3d 691, 696 (Kan. Ct. App. 2014) ("Voluntariness ultimately must be determined holistically."); *S.W.*, 124 A.3d at 93 ("We reinforce the necessity of looking holistically at every custodial interrogation in reaching a conclusion specific to the facts presented.").

Second, the majority's outsized emphasis of the circuit court's findings that Samluk subjectively intended to be "courteous" and that the police officers intended to "make [Thomas] feel at ease" is unjustified. *Ante* at 22. What Samluk or the officers intended in the moment when Samluk gave his instruction is not determinative of the instruction's effects on Thomas's capacity for free choice—because even if Samluk or the officers did subjectively intend courtesy in that moment, Thomas may have experienced the coercion of a legally binding instruction. Such an interpretation would have been natural because of the literal words that Samluk spoke to Thomas in the police station, not because of how anyone intended to make Thomas feel. At the

most, intended courtesy could be considered among the totality of the circumstances—but the majority's heavy emphasis of these findings is unjustified and, to the extent that it substitutes for consideration of what Thomas could have naturally believed—a relevant part of the totality of the circumstances analysis in this case—erroneous. *See Thomas*, 72 Va. App. at 582.

Third, the majority errs by relying on the precedent applicable only to the noncustodial context, rather than our fifty years of precedent governing custodial interrogation. After discussing subjective intent, the majority adds, "Thomas also conflates the pressure that a probationer would naturally feel to speak with his probation officer and the police in this situation with whether Thomas was coerced into waiving his privilege against self-incrimination." *Ante* at 23. The majority uses this statement as a transition to begin quoting at length from *Minnesota v. Murphy*, in which the Supreme Court found, in a noncustodial context, "that the general obligation to appear and answer [a probation officer's] questions did not in itself convert [a probationer's] otherwise voluntary statements into compelled ones." *Ante* at 23 (quoting *Murphy*, 465 U.S. at 427). In one place, the majority quotes from *Murphy* and adds its own emphasis: "The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment *unless the witness is required to answer over his valid claim of privilege*." *Id.* at 23-24 (emphasis added in majority opinion).

The majority's invocation of *Murphy* is deeply misleading. *Murphy* was a noncustodial case in which the Supreme Court *explicitly acknowledged* that its analysis did not govern custodial interrogations. *Murphy*, 465 U.S. at 429. The central holding of *Murphy* was that a probation officer's questioning of a probationer is not legally equivalent to a custodial interrogation and that therefore, *unlike* in a custodial interrogation (like the one at issue here), *Miranda* warnings do not have to be provided and the privilege is not self-executing. *Id.* at 427-34. *Murphy* states nothing about the weight to afford a probation officer's participation in a

*custodial* interrogation in a totality-of-the-circumstances voluntariness assessment—the legal question posed by this case. And the majority does not cite *Murphy* for this purpose. Rather, while the majority ultimately acknowledges that *Murphy* was noncustodial, it appears first to apply the case as an incorrect categorical rule that the pressures to obey one's probation officer are irrelevant to voluntariness. Thus, for the majority, *Murphy* demonstrates that Thomas "conflates" the pressures he faced to obey his probation officer's instructions in custody with coercion. *Ante* at 23. This misapplication of *Murphy* appears to permit the majority to sidestep the required weighing of the pressure Samluk's instruction placed on Thomas in the context of all the surrounding circumstances, including Thomas's legal obligations to obey Samluk, close relationship with Samluk, and intellectual disability.

The majority also appears to use *Murphy* for a second, somewhat perplexing reason. After belatedly acknowledging that it was a noncustodial case, the majority says that *Murphy*'s "principles" nonetheless apply here because the provision of *Miranda* warnings "reset" Thomas's invocation obligations. *Ante* at 26. This view both dismisses and presumes the answer to this case's central question: whether the *Miranda* warnings sufficed to overcome the coerciveness of the surrounding circumstances. The majority's use of *Murphy* for the first purpose would be legal error. Its use of *Murphy* for the second purpose, because it presumes the answer to the voluntary-waiver inquiry, can have no bearing on the case's outcome.

\* \* \*

The majority offers a thorough, textbook analysis of the limitations of *Miranda*, but fundamentally errs by applying the incorrect standard of review, failing to perform a totality of the circumstances analysis, giving undue weight to the subjective intent of the probation officer and police at the time of the instruction, and by misinterpreting and failing to follow settled precedent. When using the correct totality of the circumstances analysis, we find that Thomas

did not and could not voluntarily waive his Fifth Amendment rights guaranteed to him by the Constitution and safeguarded by *Miranda*. We would uphold the panel decision, reverse, and remand the case to the circuit court for further proceedings consistent with the panel opinion.

# *VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **16th** *day of* **April, 2024**.

Elwood Lewis Thomas, Appellant,

against      Record No. 1429-22-4
         Circuit Court Nos. FE-2020-515, FE-2021-37 and FE-2021-38

Commonwealth of Virginia, Appellee.

Upon a Petition for Rehearing En Banc

Before the Full Court

On March 26, 2024, the appellee, by the Attorney General of Virginia, filed a petition requesting that the Court set aside the judgment rendered on March 12, 2023, and grant a rehearing en banc on the issue(s) raised in the petition.

On consideration whereof and pursuant to Rule 5A:35 of the Rules of the Supreme Court of Virginia, the Court grants the petition for rehearing en banc and reinstates the appeal of those issues on the docket. The Court stays the mandate previously entered in this case pending the Court's en banc decision.

The parties must file briefs in compliance with the schedule set forth in Rule 5A:35(b).

A Copy,

Teste:

A. John Vollino, Clerk

By:    *original order signed by a deputy clerk of the*
       *Court of Appeals of Virginia at the direction*
       *of the Court*

Deputy Clerk

UNPUBLISHED

Present:   Judges Causey, Raphael and Senior Judge Clements
Argued at Richmond, Virginia


ELWOOD LEWIS THOMAS

MEMORANDUM OPINION* BY
v.        Record No. 1429-22-4        JUDGE JEAN HARRISON CLEMENTS
MARCH 12, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Grace Burke Carroll,[1] Judge

Bryan Kennedy, Senior Assistant Public Defender (Jessica Newton,
Assistant Public Defender, on briefs), for appellant.

Collin C. Crookenden, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted Elwood Lewis Thomas of two counts of rape, two counts of animate object

sexual penetration, and two counts of aggravated sexual battery committed against A.R.  *See* Circuit

Court No. FE-2021-37.  Subsequently, Thomas pleaded guilty to two unrelated counts of

aggravated sexual battery for crimes against two other victims.  *See* Circuit Court Nos.

FE-2020-515; FE-2021-38.  The trial court sentenced Thomas in all three cases at a joint sentencing

hearing.

Thomas challenges his jury convictions on three grounds.  First, he argues that the trial court

erred by denying his motion to suppress incriminating statements he made to law enforcement

during a custodial interrogation.  Second, he argues that the trial court violated his due process right

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Judge David Bernhard presided over Thomas's suppression motion.  Judge Stephen C.
Shannon considered Thomas's pretrial motion to exclude the Commonwealth's expert.  Judge
Grace Burke Carroll presided over the trial and sentencing.

to present a defense by excluding his mother's testimony about facts that he contends would have shown those incriminating statements were false. Third, he argues that the trial court abused its discretion by allowing the Commonwealth to present expert testimony about delayed reporting and memory formation in child victims. Thomas also challenges his sentences in all cases on the ground that the trial court did not properly consider his mitigating evidence. We agree with Thomas that the trial court erred by not suppressing his incriminating statements. Accordingly, we reverse his jury convictions and remand for further proceedings. But we affirm Thomas's sentences for the aggravated sexual battery convictions arising from his guilty pleas.

BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018)).

Thomas's grandmother operated a daycare at her house, where Thomas also lived. A.R. attended that daycare from 2008 to 2012, when she was between 4 and 8 years old and Thomas was between 24 and 28 years old.

Thomas "raped [A.R.] multiple times" at the daycare. On one occasion, he carried her downstairs, removed her pants, and put his penis in her vagina. A.R. testified that Thomas put his penis in her vagina "more than 20 times" from 2008 to 2012 but could not remember exactly how often he had done so. Thomas also inserted his finger into A.R.'s vagina on numerous occasions. A.R. described two such incidents as representative but again could not remember how often Thomas had abused her in that way. Thomas repeatedly told A.R. not to tell anybody

- 2 -

about the abuse. A.R. did not disclose the abuse until July 2019, when she told her mother that Thomas had sexually abused her. A.R.'s mother contacted the police, who interviewed A.R. Child abuse forensic interviewer Anissa Tanksley also interviewed A.R. in July 2019. A.R. waited so long to disclose the abuse because she "felt scared" that "something was going to happen to" her if she reported Thomas.

A.R. was not Thomas's only victim at the daycare. In 2013, the trial court convicted him of aggravated sexual battery of a victim under 13 years old for an offense he committed in 2002 against a victim other than A.R. For that offense the trial court sentenced Thomas to 8 years in prison with 7 years suspended, conditioned upon 20 years of supervised probation. Thomas served his active sentence and began probation. The requirements of his probation included conditions related to his status as a sex offender as well as standard probation conditions, including that he follow his probation officer's instructions, be truthful and cooperative, and report as instructed.

Thomas's probation officer, Joseph Samluk, closely monitored Thomas's life for more than five years. He regulated Thomas's internet usage and prohibited him from visiting many public places. He also subjected Thomas to regular polygraph tests during which Thomas had to discuss intimate details about his life.

Based on A.R.'s delayed disclosures, Fairfax County police officers coordinated with Samluk to arrest Thomas at Samluk's office in September 2019. The police wanted to arrest Thomas at the probation office so that they could control the environment and minimize the risk to officer safety. Consistent with the plan, Samluk called Thomas and asked him to come to the probation office. When Thomas arrived for what he thought was a regular probation appointment, four law enforcement officers arrested him, searched him, and transported him to an interrogation room at the police headquarters.

Detective Steven Carter asked Samluk to introduce him and Detective Jerome Gadell, Jr., to Thomas. According to Samluk, the detectives wanted Thomas to "know that [Samluk] was there." After Thomas had waited in the interrogation room for about 25 minutes,[2] Samluk entered with Carter and Gadell. Carter told Thomas that he wanted Samluk to introduce them to Thomas so they could "talk about some things." Samluk then told Thomas, "This is Detective Carter, Detective Gadell. They need to talk to you about some things. I'm going to be here for a little bit, but just go ahead and chat with them today, okay?" Samluk then left the room. The detectives did not ask Samluk to say those specific words. Both detectives admitted that they had never asked a suspect's probation officer to introduce them during a custodial interrogation.

After obtaining Thomas's basic information, Carter handed Thomas a *Miranda* consent form, saying that he was doing so because "we're the government and the government loves our forms." He also told Thomas, "I know you're going to have questions about everything, and I'm happy to talk about that stuff with you, but we have to go over this form first." When Carter told Thomas that he was writing "sexual assault" on the form, Thomas sighed loudly and buried his head in his hand. Carter then read the *Miranda*[3] warnings from the consent form. He paused after each line on the form to ask if Thomas understood; Thomas sometimes nodded his head and sometimes sat silently. After reading each right, Carter asked Thomas if they all "ma[d]e sense." Thomas stated, "Yeah. I just can't believe this is happening again." Carter responded that he was more than willing to talk to Thomas about it and "clear up some things" but they needed to go through the form first.

---

[2] During that period, Gadell brought Thomas food and water; he removed Thomas's handcuffs before leaving the room but handcuffed Thomas's left hand to the arm of his chair.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Carter then stated that "the next part is I know what my rights are. I am willing to make a statement without a lawyer present. I understand and know what I am doing. No promises or threats have been made to me by anyone." Carter read that part of the form quickly without pausing between sentences. He then told Thomas that Thomas did not have to sign the form, that it would help the detectives if he did so, and that he could still agree to talk to the detectives even if he did not sign the form. Thomas signed the form.

Thomas made incriminating statements throughout the approximately three-hour interview. For example, he admitted to putting his mouth on A.R.'s vagina three or four times and fondling her six or seven times when she "was about maybe seven or eight" years old. At one point, Carter told Thomas that A.R. alleged that Thomas's "private part" had touched A.R.'s "private part." Thomas responded that he did not remember that happening but stated that if A.R. said it happened, it probably did. Carter suggested that maybe Thomas rubbed his penis against A.R.'s vagina without penetrating her. Thomas responded that he possibly did so. Thomas wrote a letter during the interview, stating, "Dear [A.R.] I hope you can find it in your heart to forgive me one day. I hope everything will be good with you. I hope you can still have a bless[ed] life and I want nothing but the best from and for you."

Before trial, Thomas moved to suppress the incriminating statements, arguing that they were involuntary because he had been forced to choose between waiving his *Miranda* rights and violating his probation conditions. At the suppression hearing, Detectives Gadell and Carter testified that Thomas had more than a dozen police contacts during the 2012 investigation and at one point provided a voluntary statement after being read his *Miranda* rights. Both detectives acknowledged that Thomas had been described as "mentally retarded" or "intellectually disabled" in a 1999 police report. Gadell knew that Thomas attended an alternative school and

had a "mental health history" with the county government. Carter knew Thomas had attended an alternative school but was not aware whether Thomas had a mental health diagnosis.

The trial court denied Thomas's suppression motion, finding that he knowingly, intelligently, and voluntarily waived his *Miranda* rights. The court found that Thomas appeared to be in disbelief about what was happening to him but otherwise understood his circumstances and "appeared at ease." In finding that Thomas understood his rights, the court emphasized Thomas's prior experience with the criminal justice system. The court suggested that the result might have been different had Samluk told Thomas to "[a]nswer all the[ detectives'] questions truthfully" but found that Samluk's instruction to Thomas did not render his *Miranda* waiver involuntary.

The Commonwealth provided notice of intent to introduce expert testimony from Anissa Tanksley, the forensic interviewer who had interviewed A.R. Before trial, Thomas moved to exclude her testimony, arguing that it improperly opined on the ultimate issue of A.R.'s credibility. The court denied Thomas's motion "subject to the Commonwealth laying a proper foundation at trial."

Tanksley testified at trial that she worked at a children's advocacy center as a forensic interviewer. After graduating college in 2014, she trained in victim advocacy and began working in victim services. She transitioned to sexual assault response services, where she worked with two children's advocacy centers and became a forensic interviewer in 2017. She had attended trainings in child development, maltreatment, trauma, memory, and disclosure of physical and sexual abuse. She began her current role in 2020, which involves interviewing children regarding allegations of abuse. She had interviewed more than 600 children in her career. She was not a psychologist, psychiatrist, or neuroscientist, nor had she published any peer-reviewed research.

The Commonwealth moved to admit Tanksley as an expert in "child forensic interviewing with a focus on . . . disclosures of sexual assault and memory formation." Thomas objected, arguing that (1) Tanksley was not an expert in memory formation and merely relied on articles she had read, which were impermissible hearsay; (2) her testimony improperly opined on the ultimate issue in the case—A.R.'s credibility; and (3) delayed disclosure was within the average juror's understanding. The trial court overruled Thomas's objections.

Tanksley testified that delayed disclosure is common in child abuse cases and that children vary in how long they wait before disclosing. She explained that most children do not disclose, and it is "rare that a child will disclose immediately after an abusive incident." She also discussed various reasons children choose not to immediately disclose abuse. In her "training and experience," the most common explanation for delayed disclosure is fear. She added that it is common for children to disclose only part of the abuse they suffered, particularly when they have been abused repeatedly.

Tanksley also discussed how memories form in children and how children recall those memories. She explained that it can be difficult to recall specific episodes. Instead, "when a child remembers an account of what usually happened when they experienced abuse, that can actually lead to the fading of memory of some of those episodic details." Accordingly, "for children who are recalling information about historical abuse, it may be difficult for them to speak to how many times something occurred." She admitted that much of her research in memory formation came from five articles she had read that discussed international studies. She testified that those articles were consistent with her training and experience in interviewing children and that it was common for those in her field to rely on similar articles. Tanksley testified that she does not evaluate a child's credibility during a forensic interview and does not keep statistics about how often a child's claims are verified.

In his defense, Thomas sought to introduce his mother's testimony that he was forgetful and susceptible to other people's suggestions. He argued that the testimony was relevant to show that at least some of his incriminating statements were false. The court excluded the proposed testimony as "too speculative."

The jury convicted Thomas of two counts of rape, two counts of animate object sexual penetration, and two counts of aggravated sexual battery against A.R.[4] The trial court denied Thomas's subsequent motion to set aside the verdict. Thomas also pleaded guilty to aggravated sexual battery in two other cases involving two unrelated victims.

The court held a joint sentencing hearing for all three cases. Thomas filed a memorandum before the hearing, asserting that he had completed sex offender treatment, had not reoffended, and generally had been successful on probation. The memorandum also explained that Thomas had several mental health disorders, including attention deficit hyperactivity disorder, Tourette's syndrome, and various intellectual disabilities. Finally, Thomas claimed that he had experienced extreme physical and sexual abuse as a child, sometimes from his mother's boyfriends and sometimes from his teachers who did not know how to deal with his mental disorders.

Thomas's stepfather testified that Thomas had a childlike nature and that other people regularly took advantage of him. Thomas's family would support him upon his release as they had while he was on probation. Samluk testified that he had a good relationship with Thomas and that Thomas had successfully completed sex offender treatment while on probation. In fact, in 2019, Samluk considered requesting that the court terminate Thomas's probation early because it had been successful.

---

[4] The jury acquitted Thomas of two counts of rape. The trial court struck the evidence of a sodomy charge and one additional count of rape.

The Commonwealth asked the trial court to sentence Thomas to life in prison. Thomas countered that his success on probation showed that he could be rehabilitated and that a life sentence was inappropriate. He instead requested an active sentence of four or five years.

The trial court sentenced Thomas to ten years' imprisonment for each of the aggravated sexual battery charges to which he had pleaded guilty. For the crimes against A.R., the court sentenced Thomas to four life terms plus five years in prison for each of the aggravated sexual battery convictions, to run concurrently. The court found that Thomas was "a serial pedophile" and the court "ha[d] no way of protecting the community . . . other than to impose a life sentence." When Thomas objected that the court did not give due consideration to his mitigating evidence, the court responded that it had "considered all of the things . . . presented by both sides."

ANALYSIS

I. The trial court erred by denying Thomas's suppression motion.

*A. The governing legal framework*

"No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "A defendant does not lose this protection by reason of his conviction of a crime." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984). Thus, "notwithstanding that a defendant is . . . on probation [when] he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." *Id.*

Although one seeking the Fifth Amendment's protection "*ordinarily* must assert the privilege," the Supreme Court of the United States has held that the privilege is "self-executing" in certain, inherently coercive settings. *Id.* at 429-30 (emphasis added); *see also United States v. Riley*, 920 F.3d 200, 204 (4th Cir. 2019) ("Exceptions to this general rule arise in certain situations that are viewed as inherently coercive."). No invocation is required in those circumstances. The

most common setting in which the privilege is self-executing is a custodial interrogation. *Murphy*, 465 U.S. at 429 ("A well-known exception to the general rule addresses the problem of confessions obtained from suspects in police custody.").[5] The Supreme Court has long recognized that custodial interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966); *see also Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (noting that the Supreme Court's "cases provide that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements . . . in any subsequent criminal trial").

The "inherently coercive" nature of a custodial interrogation creates "a substantial risk that the police will inadvertently traverse the fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion." *Moran v. Burbine*, 475 U.S. 412, 426 (1986). Thus, "[i]t is presumed that without proper safeguards the circumstances of custodial interrogation deny an individual the ability freely to choose to remain silent." *Garner v. United States*, 424 U.S. 648, 657 (1976). Indeed, that setting is so inherently coercive that the Supreme Court has erected a long-settled procedural hurdle to preserve the Fifth Amendment's protections: the prosecution may not "us[e] statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards *effective* to secure the privilege against self-incrimination." *Keepers v. Commonwealth*, 72 Va. App. 17, 34 (2020) (emphasis added) (quoting *Miranda*, 384 U.S. at 444); *Garner*, 424 U.S. at 657 ("Because of the danger that custodial interrogation posed to the

---

[5] The Supreme Court recognizes two additional exceptions, which make the privilege self-executing: the so-called "classic penalty" situations, *see, e.g.*, *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977); *Garrity v. New Jersey*, 385 U.S. 493 (1967), and certain tax-gambling cases, *see, e.g.*, *Marchetti v. United States*, 390 U.S. 39 (1968); *Grosso v. United States*, 390 U.S. 62 (1968).

- 10 -

adversary system favored by the privilege, the Court in *Miranda* was impelled to adopt the extraordinary safeguard of excluding statements made without a knowing and intelligent waiver of the privilege.").  At a minimum, the police must inform a suspect in their custody that he possesses certain rights, including the right to remain completely silent during questioning. *Thomas v. Commonwealth*, 72 Va. App. 560, 574 (2020) (citing *Miranda*, 384 U.S. at 479).  "A confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under *Miranda . . .* , *and* the defendant knowingly, intelligently, and voluntary waives those rights."  *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017) (emphasis added) (quoting *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012)).

It is undisputed that Thomas was subjected to a custodial interrogation; thus, Thomas was not required to invoke his Fifth Amendment privilege because the protections of the Fifth Amendment were "self-executing."  Our dissenting colleague acknowledges this critical factor but still relies heavily on non-custodial cases and insists that "the invocation requirement reattach[ed]" once Detective Carter read Thomas the *Miranda* warning.[6]  *Post* at 37.  This view is incorrect.  Even when the police provide proper *Miranda* warnings, the Commonwealth still must prove under the totality of the circumstances that the suspect waived his rights "knowingly,

---

[6] *See, e.g.*, *Salinas v. Texas*, 570 U.S. 178, 182 (2013) (noting that the subject "interview was noncustodial"); *Murphy*, 465 U.S. at 430 (noting that the defendant "was not 'in custody' when he made his incriminating admissions" to his probation officer); *United States v. Linville*, 60 F.4th 890, 895 n.3, 897 (4th Cir. 2023) (noting that, when the suspect's probation officer questioned him at the probation office, the suspect "was neither in custody nor were the circumstances sufficiently coercive to require *Miranda* warnings"); *Husske v. Commonwealth*, 252 Va. 203, 207, 217 (1996) (noting that "the defendant, just as in *Murphy*, was not in custody for purposes of receiving *Miranda* protection" when he made incriminating statements during a voluntary "suicide screening" with a doctor); *Rivera-Padilla v. Commonwealth*, 55 Va. App. 304, 311 n.5 (2009) (noting that the custodial interrogation exception "clearly ha[d] no application" to the defendant's interview with the Virginia Department of Social Services concerning her eligibility for public benefits).  The distinction between a custodial and a non-custodial interrogation, however, is pivotal.  "Concerns under *Miranda* only arise when a defendant is in custody and subjected to interrogation."  *Giddins*, 858 F.3d at 879.

intelligently, and voluntarily." *Rodriguez v. Commonwealth*, 40 Va. App. 144, 155 (2003); *see In re S.W.*, 124 A.3d 89, 105 (D.C. 2015) (excluding the suspect's incriminating statements as involuntary despite finding that the detective provided proper *Miranda* warnings and the suspect never asserted the privilege). The dispositive question presented here is not whether Thomas failed to invoke the Fifth Amendment privilege; rather, the question is whether Thomas's waiver of his *Miranda* rights was voluntary.

In the context of "a Fifth Amendment self-incrimination challenge, '[v]oluntariness is a question of law, subject to independent appellate review.'" *Secret v. Commonwealth*, 296 Va. 204, 225 (2018) (alteration in original) (quoting *Avent v. Commonwealth*, 279 Va. 175, 195 (2010)). Thus, we review the voluntariness of Thomas's *Miranda* waiver de novo. *Tirado v. Commonwealth*, 296 Va. 15, 28 (2018) (citing *Gray v. Commonwealth*, 233 Va. 313, 324 (1987)). "Subsidiary factual questions, however, are entitled to a presumption of correctness." *Secret*, 296 Va. at 225 (quoting *Avent*, 279 Va. at 195).

When conducting our independent appellate review, we apply a well-established test for voluntariness by asking whether Thomas's *Miranda* waiver was "the product of an essentially free and unconstrained choice by its maker, or whether the maker's will has been overborne and his capacity for self-determination critically impaired." *Tirado*, 296 Va. at 28 (quoting *Gray*, 233 Va. at 324); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) ("The ultimate test remains . . . . Is the [waiver] the product of an essentially free and unconstrained choice by its maker?" (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961))); *Jackson v. Commonwealth*, 267 Va. 178, 190 (2004) (same); *Swann v. Commonwealth*, 247 Va. 222, 231 (1994) (same); *Jenkins v. Commonwealth*, 244 Va. 445, 453 (1992) (same). "If the suspect's will has been overborne and his capacity for self-determination critically impaired, the confession is

considered involuntary and its use is unconstitutional." *Avent*, 279 Va. at 195 (quoting *Midkiff v. Commonwealth*, 250 Va. 262, 268 (1995)).

Under settled precedent, we assess voluntariness by examining "the totality of the circumstances," including "the defendant's age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview."[7] *Thomas*, 72 Va. App. at 582 (quoting *Keepers*, 72 Va. App. at 37); *Jackson*, 267 Va. at 190 ("When determining whether a defendant's statement was voluntarily given, we examine the totality of the circumstances, which include the defendant's background and experience as well as the conduct of the police in obtaining the waiver of *Miranda* rights and confession."); *Midkiff*, 250 Va. at 268 (same); *Rodriguez*, 40 Va. App. at 157 (holding that "a court determining whether a confession was voluntary must consider both 'the details of the interrogation' and 'the characteristics of the accused'" (quoting *Kauffmann v. Commonwealth*, 8 Va. App. 400, 405 (1989))); *see also Bustamonte*, 412 U.S. at 226 (collecting cases and explaining that determining voluntariness requires "a careful scrutiny of all the surrounding circumstances").

Manifestly, the maker's choice is not free and unconstrained if it is the product of intimidation, coercion, or deception by the police. *Tirado*, 296 Va. at 28 (quoting *Moran*, 475 U.S. at 421). "[E]vidence of coercive police activity 'is a necessary predicate to the finding that a [*Miranda* waiver] is not "voluntary."'" *Washington v. Commonwealth*, 43 Va. App. 291, 303

---

[7] The vileness of the crime and the severity of the ultimate sentence are not relevant factors under the totality of the circumstances test. The Fifth Amendment protects not only the innocent, but also those who are guilty of even heinous crimes. Thus, the prosecution may not introduce incriminating statements obtained in violation of *Miranda* at a defendant's capital sentencing hearing. *Estelle v. Smith*, 451 U.S. 454, 462-63 (1981). *See also Culombe*, 367 U.S. at 569 (acknowledging "the anxious task of reconciling the responsibility of the police for ferreting out crime with the right of the criminal defendant, *however guilty*, to be tried according to constitutional requirements" (emphasis added)).

(2004) (quoting *Commonwealth v. Peterson*, 15 Va. App. 486, 488 (1992)).  Coercive activity may include "the interrogation techniques employed, including evidence of trickery and deceit, psychological pressure, threats or promises of leniency, and duration and circumstances of the interrogation."  *Id.* (quoting *Terrell v. Commonwealth*, 12 Va. App. 285, 291 (1991)).  "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege."  *Miranda*, 384 U.S. at 476.

We agree with our dissenting colleague that the record here, including the trial court's subsidiary factual findings, does not present a "classic penalty situation,"[8] a circumstance that *also* would make the Fifth Amendment privilege self-executing.  *See Murphy*, 465 U.S. at 435.  We disagree, however, about the significance of Thomas's custodial status and Samluk's role at its inception.  Simply put, this is not an invocation case and our resolution of it requires no new exception to the invocation rule.  Instead, this case fits comfortably *within* the long-settled exception for custodial interrogations.  *See id.* at 429 ("A well-known exception to the general [invocation] rule addresses the problem of confessions obtained from suspects in police custody.").  Clearly established and widely recognized precedent demonstrates that in the inherently coercive custodial interrogation setting the defendant need not invoke his Fifth Amendment privilege; rather, in that circumstance, the privilege is self-executing.  *Miranda*, 384 U.S. at 467-68; *Murphy*, 465 U.S. at 429-30; *United States v. Frierson*, 945 F.2d 650, 660 (3d Cir. 1991) (explaining that in custodial interrogation settings, absent a valid *Miranda* waiver, "statements are deemed 'compelled' and are inadmissible although the privilege was *never claimed*" (emphasis added)).  The Commonwealth bore the burden of proving that the

---

[8] The State creates a "classic penalty situation" if it "either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation."  *Murphy*, 465 U.S. at 435.  In such a circumstance, a suspect's failure to assert the privilege would be excused, and his answers would be "deemed compelled and inadmissible in a criminal prosecution."  *Id.*

government followed all the required procedural safeguards to ensure that Thomas's waiver of the self-executing privilege was the product of a free and unconstrained choice. *Tirado*, 296 Va. at 28; *Gray*, 233 Va. at 324; *see also Bustamonte*, 412 U.S. at 225. That burden is nothing new or unique to the facts of this case. The Commonwealth bears that burden in all custodial interrogation cases, irrespective of a probation officer's participation. *See Rodriguez*, 40 Va. App. at 155 (citing *Mills v. Commonweatlh*, 14 Va. App. 459, 468 (1992)). With that proper and well-settled framework in mind, we examine de novo whether Thomas's *Miranda* waiver was voluntary under the totality of the circumstances presented here. As we explain, under the unique and specific circumstances of this case, it was not.

### B. The officers' coercive conduct

The specific facts and circumstances of this case demonstrate that the detectives employed coercive tactics. To begin, they exploited Thomas's relationship with Samluk, who had supervised Thomas for more than five years. As a condition of his probation, Thomas had to obey all of Samluk's instructions or risk the revocation of his suspended seven-year sentence.[9] The detectives capitalized on that relationship and circumstance. First, they had Samluk summon Thomas to the probation office for what Thomas thought was a routine probation appointment. Then, when Thomas reported as instructed, detectives arrested, handcuffed, and transported him to police headquarters. At Detective Carter's request, Samluk also went to police headquarters.[10] Once there, the detectives asked Samluk to introduce them to Thomas before the interrogation, so that

---

[9] The interrogation predated the enactment of Code § 19.2-306.1. Accordingly, the trial court could have revoked the entirety of Thomas's suspended sentence for any probation violation. *See* Code § 19.2-306(A) (2019); 2021 Va. Acts Spec. Sess. I ch. 538.

[10] The trial court found that Samluk placed himself "in an unusual situation" by going to the police station, which the court found was "not the best idea."

- 15 -

Thomas would "know that [Samluk] was there." During those introductions, Samluk *instructed*[11] Thomas to "go ahead and chat with" the detectives "today." He also told Thomas that he would remain at police headquarters for "a little bit."

Those circumstances were, even by the detectives' account, unusual. Detectives Carter and Gadell each stated that they had *never* enlisted a suspect's probation officer in this way during a custodial interrogation despite Carter having conducted "hundreds" of interviews.[12] The trial court found "*the instruction* is kind of, 'Chat with them a little bit,'" but that Samluk did not tell Thomas to answer the officers' questions "'or else' *in so many words*," so we agree with the dissent that the trial court's finding forecloses the "classic penalty situation" exception. (Emphasis added). But we are persuaded that the finding also acknowledges the tacit pressure to speak.[13] An expressly spoken "or else" was unnecessary because Thomas was under compulsion to follow Samluk's instructions as a condition of his probation and Samluk's instruction conflicted with Thomas's Fifth Amendment right to remain silent. *Cf. S.W.*, 124 A.3d at 104 ("In any custodial interrogation 'the seemingly benign transmittal of information to an accused may resemble the kind of mental games that largely generated the *Miranda* decision itself.'" (quoting *United States v. Brown*, 737 A.2d 1016, 1021 (D.C. 1999))).

---

[11] Our dissenting colleague characterizes Samluk's action as a "request" but the trial court expressly found that Samluk instructed Thomas to speak with the officers. *Post* at 44, 45.

[12] Despite criticizing us for applying an unprecedented approach to Samluk's preliminary participation in the custodial interrogation, the dissent does not identify a single case approving similar participation by a probation officer. The trial court lamented the lack of precedent and found that the case presented "a question of first impression."

[13] The Fifth Amendment is concerned with "governmental coercion," not merely the coercion stemming from Thomas's immediate interrogators. *See Colorado v. Connelly*, 479 U.S. 157, 170 (1986). Indeed, Samluk's instruction to Thomas to "chat with" the officers, presented what the trial court found was a "close call." Many of the trial court's other factual findings, such as the court's finding that Thomas appeared to "understand what was going on," pertained to whether Thomas waived his rights knowingly and intelligently, an issue we do not consider here.

Moreover, unlike the probationer in *Murphy*, Thomas's probation obligation included not only being truthful with Samluk, but also following all of Samluk's instructions. Thomas signed a form at the outset of his probation acknowledging that condition and his understanding that failure to comply with his probation conditions could result in his probation being revoked. Thomas thus could not simultaneously comply with Samluk's *instruction* to "chat with" the detectives "today" and invoke his Fifth Amendment right to remain silent. *Cf. United States v. Saechao*, 418 F.3d 1073, 1079 (9th Cir. 2005) ("The Fifth Amendment proscribes the use in a separate criminal proceeding of a statement obtained pursuant to a probation condition that requires a probationer to 'choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent.'" (quoting *Murphy*, 465 U.S. at 436));[14] *People v. Garcia*, 391 P.3d 1153, 1156 (Cal. 2017) (holding that, because a probation condition compelled the defendant's statements, those statements could not "lawfully be used against him a criminal proceeding"); *State v. Eccles*, 877 P.2d 799, 801 (Ariz. 1994) (en banc) (holding that a probation condition that requires a defendant to waive his Fifth Amendment rights is unconstitutional). The dissent notes that the Arizona Supreme Court noted in *Eccles* that the improper probation condition could be revised to meet constitutional standards. *Post* at 41-42. The proposed revisions notably omitted questioning by police officers investigating crimes for which the probationer has not been convicted. *Eccles*, 877 P.2d at 801. And here, the questions put to Thomas could and did incriminate him in future criminal proceedings. *Cf. id.* (noting that the "sanitized condition" only required a defendant "to respond to questions that could *not* incriminate him in future criminal proceedings" (emphasis added)). Thus, Thomas's position in custody made Samluk's instruction coercive.

---

[14] In *Saechao*, the Ninth Circuit distinguished *Murphy* and held that a probation condition requiring a probationer to "promptly and truthfully *answer all* reasonable inquiries . . . by implication forecloses a probationer's ability to exercise [his Fifth Amendment] right by remaining silent." *Saechao*, 418 F.3d at 1079.

- 17 -

The trial court's subsidiary factual findings do not undermine our conclusion because "[s]ubtle psychological coercion suffices . . . and at times [may be] more effective[], to overbear 'a rational intellect and a free will.'" *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) (holding a confession involuntary where the interrogating officer's statements caused the defendant to fear that she would not see her children for a long time unless she cooperated); *see also Bustamonte*, 412 U.S. at 228 (explaining that coercion that is "subtly . . . applied" may render involuntary a suspect's consent to search under the Fourth Amendment); *S.W.*, 124 A.3d at 101 ("[W]e take great care to assess the impact of subtle interrogation tactics."). Neither did the officers provide any assurance that no penalty would be exacted if he disregarded Samluk's instruction to "chat with" the officers. *Cf. Missouri v. Seibert*, 542 U.S. 600, 611 (2004) (plurality) ("[T]elling a suspect that 'anything you say can and will be used against you,' *without expressly excepting* [an incriminating statement already given] could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail." (emphasis added)).

By focusing on the lack of an explicit threat and contending that our "rationale hinges on the probation officer's" statement, the dissent wrongly divorces Samluk's instruction from the context in which it occurred. *Post* at 35. Settled precedent requires that our voluntariness analysis consider the totality of the circumstances. *Bustamonte*, 412 U.S. at 226; *Secret*, 296 Va. at 226; *Thomas*, 72 Va. App. at 582; *Jenkins*, 244 Va. at 454. In undertaking that analysis, "we eschew any 'divide-and-conquer analysis' that ignores the 'totality of the circumstances.'" *Shifflett v. Commonwealth*, 58 Va. App. 732, 740 (2011) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)); *see also People v. Stewart*, Mich. No. 162497, 2023 WL 4874412, at *11 (Mich. July 31, 2023) (recognizing that "we must consider the circumstances collectively and their cumulative effect on defendant's free will"); *State v. Baker*, 465 P.3d 860, 870 (Haw. 2020) ("Crucially, a court must not analyze the individual circumstances in isolation, but must weigh

those circumstances in their totality."); *State v. Fernandez-Torres*, 337 P.3d 691, 696 (Kan. Ct. App. 2014) ("Voluntariness ultimately must be determined holistically."); *S.W.*, 124 A.3d at 93 ("We reinforce the necessity of looking holistically at every custodial interrogation in reaching a conclusion specific to the facts presented.").

Samluk was not required to remind Thomas of his probation conditions every time he gave Thomas an instruction. Even if Samluk subjectively did not intend to revoke Thomas's probation, we will not impose on Thomas the obligation to discern the probation officer's subjective intent because Thomas had no way to assess it. *See Mace v. Amestoy*, 765 F. Supp. 847, 851 (D. Vt. 1991) ("The petitioner could not possibly assess the likelihood of prosecution which is totally dependent upon the discretion of the state's attorney."). Thomas reasonably could have understood, based on the literal meaning of Samluk's words, that he was required as a condition of his probation to talk to the detectives "today." Thomas also reasonably could have interpreted Samluk's statement that he would remain at police headquarters "for a little bit" to indicate that he would know if Thomas had not obeyed his instruction to speak with the detectives, further raising the specter of revocation for non-compliance.

No new per-se rule follows from our recognition that the unique and specific facts of this case demonstrate Thomas was subjected to coercive pressures to waive his *Miranda* rights.[15]

> The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused.

---

[15] The problem presented here is not that Samluk was "involved" in the interrogation. *Post* at 35, 44. The problem is that Samluk specifically instructed Thomas to speak with the officers.

*United States v. Preston*, 751 F.3d 1008, 1028 (9th Cir. 2014) (quoting *Haynes v. Washington,* 373 U.S. 503, 515 (1963)).  Rather, we consider the tacit pressure Samluk's instruction created "as a relevant circumstance to be considered as one factor in the voluntariness analysis, which is consistent with decades of established caselaw."  *Stewart*, 2023 WL 4874412, at \*10.

### C.  The Miranda *warning was ineffective*

The detectives did not cure the effects of their coercive conduct merely by reciting Thomas's *Miranda* rights.  The Supreme Court has recognized that "it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance."  *Seibert*, 542 U.S. at 611.  If the surrounding circumstances show that the *Miranda* warnings were ineffective to safeguard the privilege, the resulting *Miranda* waiver is not voluntary.  *Id.*  "[U]nless the warnings could place a suspect" in a position to make a *genuinely informed* choice, "there is no practical justification for accepting the formal warnings as compliance with *Miranda*."  *Id.* at 612.  "The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation."  *Miranda*, 384 U.S. at 476.  Indeed, a "confession, even if obtained in full compliance with *Miranda*, may be inadmissible if it was not voluntary."  *Kauffman*, 8 Va. App. at 405.

*Miranda* warnings may be ineffective because of law enforcement conduct during or preceding the warnings.  *See, e.g.*, *Stewart*, 2023 WL 4874412, at \*11 (improper promises of leniency); *Giddins*, 858 F.3d at 883 (misleading responses about the effect of the statements).  For example, when an officer deliberately obtains a prewarning confession before advising the suspect of his *Miranda* rights, later warnings are ineffective unless they clarify that the suspect may remain silent *notwithstanding* his earlier decision to speak.  *Seibert*, 542 U.S. at 612-14.

Similarly, when an officer has a lengthy prewarning conversation with a suspect that "soften[s]-up" that suspect to waive his rights before the officer formally advises him of those

- 20 -

rights, the formal advisement is ineffective. *People v. Honeycutt*, 570 P.2d 1050, 1054-55 (Cal. 1977). *Miranda* warnings may also be ineffective when the officers "downplay[] the importance of the advisement and the rights contained therein," and "impl[y] that the advisement [is] a mere formality." *People v. Smiley*, 530 P.3d 639, 649 (Colo. 2023). Thus, special caution should be applied in circumstances where pre-warning conduct "obscure[s] both the practical and legal significance of the admonition when finally given." *Secret*, 296 Va. at 223 (quoting *Seibert*, 542 U.S. at 620 (Kennedy, J. concurring)). As with the rest of the analysis, therefore, we must consider the totality of the circumstances when determining whether *Miranda* warnings neutralized the coercive circumstances present here.[16]

Under the facts of this case, Carter's recital of the *Miranda* warnings was ineffective to cure the coercive circumstances. As noted, the warnings did not clarify that Samluk's *instruction* that Thomas "chat with" the detectives had no bearing on Thomas's right to remain silent. Neither Samluk nor the detectives clarified that Thomas would *not* suffer any adverse probationary consequences if he chose to stand on his self-executing right to remain silent even though doing so would violate Samluk's express instruction. *Cf. Seibert*, 542 U.S. at 612-14. Samluk's prewarning statement coercively primed Thomas to waive his rights *before* Carter read from the *Miranda* form, and the officers provided no additional procedural safeguards to cure that problem. *See, e.g.*,

---

[16] Relying on *Oregon v. Elstad*, 470 U.S. 298 (1985), the dissent asserts that "courts normally presume that [*Miranda*] warnings neutralize the coercion implicit in custodial settings enough to shift back to the defendant the obligation to invoke his Fifth Amendment rights." *Post* at 37. But as the *Seibert* Court recognized, *Elstad* did not involve any coercive police conduct. *Seibert*, 542 U.S. at 614-16. And *Elstad* itself made clear that the Court did not "condone inherently coercive police tactics or methods offensive to due process that . . . undermine the suspect's will to invoke his rights once they are read to him." *Elstad*, 470 U.S. at 317. "Indeed, as the Court explained, the *Miranda* exclusionary rule 'sweeps more broadly than the Fifth Amendment itself' because the Fifth Amendment only prohibits the use of compelled testimony by the prosecution in its case in chief." *Secret*, 296 Va. at 218 (quoting *Elstad*, 470 U.S. at 306-07).

*Giddins*, 858 F.3d at 883 (recognizing the importance of how a reasonable person would understand the pre-warning statements authorities made).

Additionally, when the *Miranda* warning finally came, Carter repeatedly deemphasized its importance and presented it as a mere formality. *Smiley*, 530 P.3d at 649. Throughout, Carter kept the focus on the *Miranda* waiver *form*, which he presented as an administrative box they needed to check before *he* could answer Thomas's questions. Carter told Thomas that they needed to discuss the form because "we're the government and the government loves our forms." He presented the form as impeding his ability to help Thomas explaining, "I know you're going to have questions about everything, and I'm happy to talk about that stuff with you, but we have to go over this form first." Rather than emphasize that he was asking Thomas to waive his constitutional rights, Carter characterized the form's waiver language as merely "the next part" of the form before reading the rights being waived or the consequences of the waiver without explanation or pause. Carter then told Thomas that it would help the detectives if Thomas signed the form but that he could "still agree" to talk to them even if he did not sign it. Carter's characterization of the *Miranda* rights as a mere formality, in the context of the doubly coercive environment the officers had created, rendered the warnings ineffective to resolve the apparent conflict between Thomas's rights and Samluk's instruction.

### D. Thomas's will was overborne

Settled precedent requires us to examine the totality of the circumstances to determine whether Thomas made a free choice to waive his rights. *Tirado*, 296 Va. at 28; *Gray*, 233 Va. at 324; *Bustamonte*, 412 U.S. at 225; *Stewart*, 2023 WL 4874412, at *13. The totality of the circumstances presented here demonstrate that Thomas's waiver was not the product of a free and unconstrained choice. The trial court made no findings concerning Thomas's education or

intellectual ability, but the record demonstrates that Thomas's background and experience made him particularly vulnerable to the coercion applied in this case.

"An individual's repeated exposure to *Miranda* warnings *may* weigh in favor of concluding that the individual knowingly and intelligently waived those rights." *Rodriguez*, 40 Va. App. at 157 (emphasis added). And "a low intelligence quotient, in and of itself, does not mean that a suspect is incapable of waiving his rights." *Rankin v. State*, 1 S.W.3d 14, 19 (Ark. 1999). Nevertheless, "[i]f mental impairment of whatever kind should have reasonably been apparent to the interrogators, special care should have been exercised, and a lesser quantum of coercion would render the confession involuntary." *United States v. Sablotny*, 21 F.3d 747, 752 (7th Cir. 1994). "Coercive tactics that can overbear an individual's will include both physical intimidation and psychological pressure." *Stewart*, 2023 WL 4874412, at *4; *Smith v. Duckworth*, 910 F.2d 1492, 1497 (7th Cir. 1990) (explaining that, "while a finding of involuntariness cannot be predicated solely upon [a defendant's] mental instability, his mental state is relevant 'to the extent it made him more susceptible to mentally coercive police tactics'" (quoting *Andersen v. Thieret*, 903 F.2d 526, 530 n.1 (7th Cir. 1990))).

Indeed, "the degree of pressure necessary to crush one's will varies with the individual." *Robinson v. Commonwealth*, 63 Va. App. 302, 311 (2014) (quoting *Hill v. Commonwealth*, 52 Va. App. 313, 319 (2008)). A person "of normal intelligence . . . is more resistant to interrogation than a person who is very young, uneducated or weak minded." *Miller v. Fenton*, 796 F.2d 598, 606 (3d Cir. 1986). It simply "takes less" in terms of sophisticated police interrogation techniques "to interfere with the deliberative processes of one whose capacity for rational choice is limited than it takes to affect the deliberative processes of one whose capacity is not so limited." *Preston*, 751 F.3d at 1023 (quoting *Duckworth*, 910 F.2d at 1497). C*ompare id.* (considering defendant's "reduced mental capacity" as among the circumstances rendering his

confession involuntary); *Thomas v. North Carolina*, 447 F.2d 1320, 1322 (4th Cir. 1971) (finding a confession involuntary in part because of the defendant's "low mentality" and "limited education"), *with Avent*, 279 Va. 195 (finding the defendant's *Miranda* waiver voluntary in part because the defendant was "a man of at least average intelligence"); *Jackson*, 267 Va. at 190 ("The court also noted that the defendant had a reported IQ score of 100 and an educational level sufficient to read and write."); *Roach v. Commonwealth*, 251 Va. 324, 341 (1996) ("The record shows that Roach was of average intelligence, and that he telephoned Sheriff Morris to initiate the questioning."); *Swann*, 247 Va. at 231 ("Swann, a high school graduate who had attended one semester of college, was no stranger to the judicial system."). Moreover, a suspect who "suffers from mental disabilities and deficiencies" is "less likely to clearly invoke his right to counsel or to remain silent," is "more likely to 'parrot' back the details the officers suggested, whether or not they [are] true," and is "more likely to place stock in any promises or threats that the officers made, however ambiguous they might be." *State v. Rettenberger*, 984 P.2d 1009, 1016-17 (Utah 1999).

The record establishes that detectives knew that an earlier police report had described Thomas as "intellectually disabled."[17] They also knew that Thomas had attended an alternative school and had a mental health history with the county government. Thomas's impaired functioning made it more likely that he would have understood Samluk's instruction as an implied threat. *See id.*

Thomas's experience with the criminal justice system also rendered him more susceptible to the tacit pressure present here than the average suspect.[18] We will not reflexively hold any prior

---

[17] The trial court made no factual findings concerning Thomas's personal characteristics and how those characteristics impacted his ability to resist the coercion brought to bear against him.

[18] We are of course bound by the trial court's factual determinations about Thomas's experience. *Secret*, 296 Va. at 225. The effect of that experience on the voluntariness of Thomas's waiver, however, is a legal question.

experience with the criminal justice system against a defendant in all cases. Rather, as settled precedent requires, we must view this case under the totality of the circumstances, considering the implications of that experience for Thomas under the facts of this case. The Commonwealth emphasizes Thomas's experience during the 2012 investigation, but Thomas's interactions with the criminal justice system did not end in 2012. To the contrary, he had participated in highly structured supervised probation as a sex offender for nearly six years before the interrogation, forgoing many rights enjoyed by non-probationers. For example, Samluk routinely monitored Thomas's internet browsing and had instructed him to stay away from certain public places like libraries, parks, and schools. Thomas had to disclose to Samluk—often as part of a polygraph test—such personal details about his life as his romantic partners, how often he masturbated, and what he watched on television. And the record evidence confirms that Thomas consistently complied with Samluk's instructions. In other words, Thomas's experience with the criminal justice system was dominated by compelled disclosures and acquiescence to Samluk's instructions, even regarding the most intimate areas of his life. Despite Thomas's prior experience with *Miranda*, the challenged interrogation was the first time he had been asked to reconcile his *Miranda* rights with his apparently competing and compelling probation obligations.

### E. Totality of the circumstances

Thomas is a man of limited intellectual functioning who for years had obeyed his probation officer's instructions because he knew that failure to do so could result in the loss of the "grace" the prior sentencing court had extended to him. *Garibaldi v. Commonwealth*, 71 Va. App. 64, 69 (2019). The detectives subjected Thomas to an inherently coercive custodial interrogation exacerbated by the tacit pressure of a possible probation revocation. The detectives' subsequent reading of the *Miranda* warnings—presented to Thomas as a mere formality—failed to cure the coercive circumstances presented here, which overbore Thomas's ability to make a free and

unconstrained choice. We thus conclude that, under the unique circumstances of this case, Thomas's *Miranda* waiver was involuntary, and his incriminating statements were inadmissible.

### F. *Admitting the involuntary statements was not harmless error*

Admitting Thomas's incriminating statements was not harmless error. When analyzing constitutional harmless error, we ask whether it is "clear beyond a reasonable doubt that a rational [factfinder] *would have* found the defendant guilty absent the error." *Commonwealth v. White*, 293 Va. 411, 422 (2017) (alteration in original) (quoting *Neder v. United States*, 527 U.S. 1, 17 (1999)). "A confession is like no other evidence." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). Incriminating statements, "deliberately made, precisely identified and clearly proved afford[] evidence of a most satisfactory nature and may furnish the strongest and most convincing evidence of truth." *Prince v. Commonwealth*, 228 Va. 610, 613 (1985). Here, Thomas's incriminating statements were powerful evidence, without which the Commonwealth's case rested primarily on A.R.'s testimony. A fact finder should access A.R.'s credibility without the improperly admitted statements.

In sum, applying well-settled precedent, we hold that based on the totality of the circumstances presented in this case, Thomas's *Miranda* waiver was not the product of a free and unconstrained choice, and the trial court erred in reaching a contrary conclusion. That error was not harmless. Accordingly, we reverse Thomas's jury convictions and remand for a new trial should the Commonwealth be so advised.[19]

---

[19] Given our holding that Thomas's *Miranda* waiver was involuntary, we do not address his separate argument that it also was not knowing or intelligent. "[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Taylor v. Commonwealth*, 78 Va. App. 147, 157 (2023) (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015)).

In addition, when we remand a case for a new trial, we generally address only the issues in the appeal that are likely to arise on remand. *Cain v. Lee*, 290 Va. 129, 136 (2015); *Campbell v. Commonwealth*, 162 Va. 818, 831-32 (1934). Thomas's first assignment of error argues that the trial court erred by excluding his mother's testimony, which was relevant to explain why he made

II. The trial court did not abuse its discretion by allowing Tanksley's expert testimony.

"It is well-settled that '[d]ecisions regarding the admissibility of evidence "lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion."'" *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) (quoting *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019)). "A court has abused its discretion if its decision was affected by an error of law or was one with which no reasonable jurist could agree." *Tomlin v. Commonwealth*, 74 Va. App. 392, 409 (2022). Whether to admit or exclude expert testimony is similarly "a matter within the sound discretion of the circuit court, and we will reverse the circuit court's judgment only when the court has abused this discretion." *Lucas v. Riverhill Poultry, Inc.*, 300 Va. 78, 92 (2021).

Generally, expert testimony is permitted if three conditions are met. First, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Va. R. Evid. 2:702(a)(i)-(ii). Second, the testimony must be "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Finally, the testimony must be "beyond the knowledge and experience of ordinary persons, such that the jury needs expert opinion in order to comprehend the subject matter, form an intelligent opinion, and draw its conclusions." Va. R. Evid. 2:702(a)(ii).

Thomas contends that Tanksley's testimony was inadmissible because (1) the average juror already understands delayed disclosure; (2) the testimony commented directly on A.R.'s credibility; and (3) the testimony was inadmissible hearsay.[20] We address each argument in turn.

_____

the incriminating statements. Given our holding, the controversy surrounding that testimony is unlikely to arise on remand in the same posture that it is presented to us in this appeal. Accordingly, we do not consider that assignment of error. The admissibility of Tanksley's testimony, however, is likely to arise on remand. Thus, we consider Thomas's challenge to that testimony.

[20] Thomas conceded at oral argument that he is not challenging Tanksley's qualifications on appeal.

Binding precedent forecloses Thomas's first argument. We have previously held that experts can possess knowledge in delayed disclosure above that possessed by the average juror. *See, e.g.*, *Stevens v. Commonwealth*, 72 Va. App. 546, 553-56 (2020) (holding that an expert witness's "general testimony about the circumstances faced by child sexual abuse victims and the reasons why they often delay reporting the abuse . . . was appropriate for the jury's consideration" and that the expert possessed knowledge of child abuse reporting "beyond that of persons of common intelligence and ordinary experience" (quoting *Justiss v. Commonwealth*, 61 Va. App. 261, 271 (2012))); *Kilby v. Commonwealth*, 52 Va. App. 397, 411 (2008) (holding that the Commonwealth's delayed disclosure expert "clearly ha[d] 'a degree of knowledge of a subject matter beyond that of persons of common intelligence and ordinary experience'" (quoting *Conley v. Commonwealth*, 273 Va. 554, 560 (2007))). Although the average juror may understand that delayed reporting sometimes occurs, they can still benefit from context about why and how often provided by an expert in the field.

Turning to Thomas's second argument, jurisdictions are split on whether to admit expert testimony about children's behavior following alleged abuse. A majority of states permit general expert testimony about how sexually abused children act after being abused but do not allow direct or indirect endorsement of a child's credibility. *See, e.g.*, *State v. Celis-Garcia*, 344 S.W.3d 150, 159-60 (Mo. 2011) (en banc) (explaining that expert testimony about "the general behaviors and characteristics commonly found in children who have been sexually abused" may be admitted but "particularized testimony . . . regarding the specific victim's credibility . . . usurps the jury's province to determine a witness's credibility"); *State v. Hazelton*, 987 A.2d 915, 921-22 (Vt. 2009) (explaining that "expert testimony regarding the profile of young sexual assault victims" is admissible but may not be "tantamount to a direct comment that the complainant [is] telling the truth about the alleged sexual assault" (alteration in original)); *Commonwealth v. Federico*, 683

- 28 -

N.E.2d 1035, 1038-40 (Mass. 1997) (allowing a "description of the general or typical characteristics shared by child victims of sexual abuse" but disallowing commentary on a specific child's behavior).[21]

This Court has not directly addressed the argument that delayed disclosure testimony usurps the jury's function in determining credibility. Thomas relies on *Davison v. Commonwealth*, 18 Va. App. 496, 499-501 (1994), in which the Commonwealth proffered the victims' therapist as an expert in why a child victim might recant an allegation of sexual abuse. This Court held that the expert's testimony was inadmissible because the proffered expert had read only a single article on child recantation and thus was not qualified to testify as an expert about that issue. *Id.* at 503. In addition, the Court held that the expert's testimony was offered solely to bolster the credibility of one of the victims, violating the rule that "an expert may not 'express an opinion as to the veracity of any witness." *Id.* at 504 (quoting *Fitzgerald v. Commonwealth*, 223 Va. 615, 630 (1982)). As we explained, "[s]uch evidence is a comment on an ultimate fact within the province of the jury and must be excluded by the trial court." *Id.* at 504.

In allowing delayed disclosure testimony, *Stevens* and *Kilby* distinguished *Davison*, but only as to the degree of qualifications of the experts involved. *See Stevens*, 72 Va. App. at 555-56; *Kilby*, 52 Va. App. at 411. *Stevens* and *Kilby* suggest that expert testimony about delayed disclosure is admissible in Virginia, but neither case directly addressed Thomas's ultimate fact argument.[22]

---

[21] A minority of states bar generalized expert testimony while others allow testimony particularized to the victim. *Compare, e.g.*, *Sanderson v. Commonwealth*, 291 S.W.3d 610, 612-14 (Ky. 2009) (explaining that, in Kentucky, expert testimony that it is common for sexually abused victims to delay reporting the abuse is inadmissible), *with Townsend v. State*, 734 P.2d 705, 707-08 (Nev. 1987) ("[I]t was proper for the State's expert to express an opinion on the issue of whether the child had, in fact, been sexually assaulted or abused.").

[22] In *Kilby*, the defendant raised that argument on appeal but failed to preserve appellate review by not raising it in the trial court. *Kilby*, 52 Va. App. at 408. In *Stevens*, the defendant waived his challenge to the Commonwealth's expert's delayed disclosure testimony by introducing his own expert testimony on the same subject. *Stevens*, 72 Va. App. at 556-57. And although this

Noting some tension between *Davison* and *Kilby*, one commentator has stated that "[i]t appears that Virginia will permit a qualified expert to testify to some extent, but it is not altogether clear what will or will not be permitted." 7 *Jones on Evidence* § 57:60 (7th ed. 2023).

We now clarify our case law. An expert may provide general testimony about memory formation and common post-abuse behavior but may not directly comment on the credibility of any witness. Expert testimony that child abuse victims often delay disclosing their abuse may make it more likely that the jury believes a victim's testimony, but that consequence is different from an expert opining that the victim is credible. Thus, expert testimony about memory formation and the reason for and frequency of delayed disclosures can help the jury contextualize the victim's testimony without usurping the jury's ultimate role in determining credibility.

Here, Tanksley testified that abused children often delay disclosing their abuse but she did not suggest that delayed disclosures by child victims were more or less credible than contemporary disclosures or disclosures by adult victims. In fact, she testified that she does not evaluate the credibility of the children she interviews and expressly stated she does not know how often allegations turn out to be true. Thus, Tanksley's testimony was materially different from the expert's testimony in *Davison*. In that case, the expert witness testified that "the majority of the times kids don't lie about" being abused and that the most common reason for a victim to recant "may apply directly to this case." *See Davison*, 18 Va. App. at 501-02.

Finally, Tanksley's reliance on studies not entered into evidence does not render her testimony impermissible hearsay. "Generally, an expert witness in Virginia has not been permitted to base [her] opinion on facts not in evidence." *Simpson v. Commonwealth*, 227 Va. 557, 565-66 (1984) (citing *Ortiz v. Barrett*, 222 Va. 118, 130 (1981)). Yet an expert may rely on "objective data

Court addressed the defendant's argument challenging the Commonwealth's memory formation testimony in *Stevens*, that challenge was solely to the expert's qualifications. *Id.* at 558-59.

- 30 -

customarily relied on by other experts in the field . . . when that data has not been prepared for the sole purpose of arriving at a specific opinion in the case." *Papuchis v. Commonwealth*, 15 Va. App. 281, 284 (1992) (citing *Kern v. Commonwealth*, 2 Va. App. 84, 87-88 (1986)). For example, we have allowed an expert in forensic serology to rely on published studies of population statistics to form an opinion about the prevalence in the general population of the victim's blood characteristics. *See Funderburk v. Commonwealth*, 6 Va. App. 334 (1988). The Commonwealth may not, however, enter those studies into evidence. *Papuchis*, 15 Va. App. at 285. Hearsay materials on which an expert relies are not admissible in a criminal case. *Id.*

Thomas's reliance on *Papuchis* is misplaced because, as he concedes, the Commonwealth did not offer into evidence the articles on which Tanskley relied.[23] Thomas, though, contends that Tanksley's repeated references to what the "research suggested" was "tantamount to admitting the articles themselves." We reject that contention because it clashes with the relevant precedents and would overly restrict expert testimony. Just as the expert's testimony in *Funderburk* about population statistics was not the functional equivalent of entering those studies into evidence, Tanksley's testimony about the "research" was not impermissible hearsay. *See Stevens*, 72 Va. App. at 559 (noting that the expert "based her testimony on her 'training, experience, and . . . [the] literature'").

Tanksley testified that the articles she had read were consistent with her training and experience and that it was common for those in her field to rely on such articles. Based on that testimony, we cannot say that the trial court abused its discretion in allowing Tanksley to testify about the research or in denying Thomas's motion to set aside the verdict on that basis.

---

[23] Thomas's reliance on *Earnest v. Commonwealth*, 61 Va. App. 223 (2012), is similarly misplaced. In *Earnest*, this Court held that the witness could not testify about outside reports or cases because he was not a qualified expert. *Id.* at 228-29.

III. The trial court did not abuse its sentencing discretion.

Determining the sentence "lies within the sound discretion of the trial court. A sentencing decision will not be reversed unless the trial court abused its discretion." *Garibaldi*, 71 Va. App. at 67 (quoting *Martin v. Commonwealth*, 274 Va. 733, 735 (2007)). "Criminal sentencing decisions are among the most difficult judgment calls trial judges face." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 563 (2016). "Because this task is so difficult, it must rest heavily on judges closest to the facts of the case—those hearing and seeing the witnesses, taking into account their verbal and nonverbal communication, and placing all of it in the context of the entire case." *Id.* Consequently, "when a statute prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum, the sentence will not be overturned as being an abuse of discretion." *Id.* at 564 (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007)). It is also within the trial court's purview to weigh a defendant's mitigation evidence. *Keselica v. Commonwealth*, 34 Va. App. 31, 36 (2000).

The trial court sentenced Thomas to 10 years' imprisonment for each count of aggravated sexual battery of a victim under 13 years old to which he pleaded guilty.[24] Each of those offenses carried a statutory sentencing range of 1 to 20 years in prison. Code § 18.2-67.3(B). "[O]nce it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end." *Thomason v. Commonwealth*, 69 Va. App. 89, 99 (2018) (quoting *Minh Duy Du*, 292 Va. at 565). The trial court was not required to mention any of Thomas's mitigation evidence or explain the weight it attached to that choice. *See Bowman v. Commonwealth*, 290 Va. 492, 500 n.8 (2015) ("Absent a statutory requirement to do so, 'a trial

---

[24] Because we reverse Thomas's jury convictions, we do not address the challenge to his sentences for those convictions.

court is not required to give findings of fact and conclusions of law.'" (quoting *Fitzgerald*, 223 Va. at 627)).

Finally, Thomas is not entitled to a remand for resentencing for the offenses against different victims based on our reversal of his convictions for the charges related to A.R. Our Supreme Court has held that, where the defendant is sentenced jointly for multiple offenses, the reversal of some of those convictions and affirmance of others does not entitle the defendant to resentencing on the affirmed convictions. *Woodard v. Commonwealth*, 287 Va. 276, 281-82 (2014). Because the sentencing guidelines "are discretionary, rather than mandatory" and cannot serve as the basis for relief on appeal, the defendant does not show prejudice by showing that the guidelines would be different on resentencing. *Id.* (citing Code § 19.2-298.01(F)); *see also Fazili v. Commonwealth*, 71 Va. App. 239, 248-49 (2019). Moreover, although the trial court held a joint sentencing hearing, it imposed separate sentences for each of Thomas's offenses. Accordingly, Thomas has not shown prejudice based on his contention that the evidence would be different during resentencing.

"The statutes dealing with probation and suspension are remedial and intended to give the trial court valuable tools to help rehabilitate an offender." *Howell v. Commonwealth*, 274 Va. 737, 740 (2007). "When coupled with a suspended sentence, probation represents 'an act of grace on the part of the Commonwealth to one who has been convicted and sentenced to a term of confinement.'" *Hunter v. Commonwealth*, 56 Va. App. 582, 587 (2010) (quoting *Price v. Commonwealth*, 51 Va. App. 443, 448 (2008)). Defendants who spurn that act of grace are routinely punished. But Thomas presents the opposite side. He has substantially availed himself of the rehabilitative tools provided him. He has completed sex offender treatment. He has been successful on probation. And most importantly, he has not committed any new offenses. We commend Thomas for his substantial efforts. That said, it is not for us to weigh Thomas's

mitigation evidence.  The precedent in this area is clear and binding, and we affirm Thomas's

sentences.

CONCLUSION

Because Thomas did not voluntarily waive his right to remain silent, the trial court should

have suppressed his confession.  Accordingly, we reverse his jury convictions and remand for a new

trial should the Commonwealth be so advised.  *See* Circuit Court No. FE-2021-37.  The trial court

did not abuse its discretion in allowing the Commonwealth's expert testimony.  We affirm

Thomas's sentences for the offenses to which he pleaded guilty.  *See* Circuit Court Nos.

FE-2020-515 and FE-2021-38.

*Affirmed in part, reversed in part, and remanded.*

Raphael, J., dissenting in part.

I join parts II and III of the majority's analysis, but I respectfully dissent from part I. The majority properly affirms Thomas's convictions for aggravated sexual battery of two young children (a boy and a girl) at the home daycare where Thomas lived. (FE-2020-515, FE-2021-38.) But the majority reverses Thomas's six convictions for rape and other sex crimes against another victim, A.R., committed from the time she was four until she was eight. (FE-2021-37). The trial court concluded that Thomas is a "serial pedophile," sentencing him for the crimes against A.R. to four life sentences plus five years. The sentencing judge found that there was "no way of protecting the community from this man other than to impose a life sentence." The majority now reverses those convictions and vacates the life sentences because it finds that Thomas's *Miranda* waiver was involuntary and that his videotaped confession should have been suppressed. The majority's rationale hinges on the probation officer's saying, after introducing the detectives to Thomas at the start of the interview, "I'm going to be here for a little bit, but just go ahead and chat with them today, okay?"

The majority reaches this surprising result by fashioning what amounts to a per-se rule that if a probation officer is involved in a custodial interrogation, he must tell the probationer that his probation will *not* be jeopardized by invoking his right to remain silent. The majority would require such a disclosure—on top of *Miranda* warnings—even though the majority concedes that the government here did not expressly or implicitly threaten the defendant with the loss of probation if he asserted his privilege against self-incrimination. Because such a supplemental warning is unprecedented and unwarranted, I respectfully dissent.

I.  The trial court properly denied the motion to suppress.

### A. *The Invocation Requirement and its two exceptions*

"It has long been settled that the privilege [against self-incrimination] 'generally is not self-executing' and that a witness who desires its protection '"must claim it."'" *Salinas v. Texas*, 570 U.S. 178, 181 (2013) (quoting *Minnesota v. Murphy*, 465 U.S. 420, 425, 427 (1984)).  The Supreme Court calls this the "invocation requirement."  *Id.* at 183, 186.  The defendant must generally invoke his right to remain silent in order to claim its benefit.  The invocation requirement applies, for instance, to

> the ordinary witness at a trial or before a grand jury who is subpoenaed, sworn to tell the truth, and obligated to answer on the pain of contempt . . . .  The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment *unless the witness is required to answer over his valid claim of the privilege*.

*Murphy*, 465 U.S. at 427 (emphasis added).

So "in the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself."  *Id.* (quoting *Garner v. United States*, 424 U.S. 648, 654 (1976)).  "Thus it is that a witness . . . ordinarily must assert the privilege rather than answer if he desires not to incriminate himself."  *Id.* at 429.  Our appellate courts too have repeatedly recognized the invocation requirement.  *See, e.g.*, *Husske v. Commonwealth*, 252 Va. 203, 217 (1996) ("[N]o one required Husske 'to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent.'" (quoting *Murphy*, 465 U.S. at 436)); *Rivera-Padilla v. Commonwealth*, 55 Va. App. 304, 311 (2009) ("[T]he issue is not whether [the defendant] was compelled to attend the meeting with DSS and answer questions in order to claim benefits, but whether she was coerced to surrender her privilege to claim benefits.").

- 36 -

The United States Supreme Court has recognized exceptions to the invocation requirement when "a witness'[s] failure to invoke the privilege must be excused [because] governmental coercion makes his forfeiture of the privilege involuntary." *Salinas*, 570 U.S. at 184. To date, however, the Court has crafted only "two exceptions." *Id.*

The first exception involves custodial interrogation. "Thus, in *Miranda*, [the Court] said that a suspect who is subjected to the 'inherently compelling pressures' of an unwarned custodial interrogation need not invoke the privilege." *Id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966)). "Due to the uniquely coercive nature of custodial interrogation, a suspect in custody cannot be said to have voluntarily forgone the privilege 'unless [he] fails to claim [it] after being suitably warned.'" *Id*. at 184-85 (alterations in original) (quoting *Murphy*, 465 U.S. at 429-30). Proper *Miranda* warnings, however, make all the difference: "the privilege against self-incrimination is self-executing" only as to "*unwarned* statements obtained through custodial interrogation." *United States v. Riley*, 920 F.3d 200, 207 (4th Cir. 2019) (emphasis added).

In other words, once the defendant in a custodial interrogation is properly advised of his rights, the invocation requirement reattaches. To benefit from the privilege, the defendant must then affirmatively invoke it. *Oregon v. Elstad*, 470 U.S. 298, 311 (1985). Indeed, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74. But the burden is on that individual, having been duly warned, to invoke the privilege.

The first exception to the invocation requirement applies here because Thomas was in custody when questioned by the detectives. But as explained below, Detective Carter administered thorough *Miranda* warnings. And courts normally presume that such warnings neutralize the coercion implicit in custodial settings enough to shift back to the defendant the obligation to invoke his Fifth Amendment rights if he wants to remain silent in response to

incriminating questions. *See Elstad*, 470 U.S. at 310-11 ("[A] careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible."). A duly administered *Miranda* warning "conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'" *Id.* at 311 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)).

A signed *Miranda* waiver, of course, is not dispositive—a "confession, even if obtained in full compliance with *Miranda*, may be inadmissible if it was not voluntary." *Kauffman v. Commonwealth*, 8 Va. App. 400, 405 (1989). "Just as 'no talismanic incantation [is] required to satisfy [*Miranda*'s] strictures,' it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance." *Missouri v. Seibert*, 542 U.S. 600, 611 (2004) (plurality) (quoting *California v. Prysock*, 453 U.S. 355, 359 (1981) (per curiam)).

Still, "'[t]he inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by *Miranda*."'" *Id.* (quoting *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989)). And "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984).

The second exception to the invocation requirement applies when the government coerces the defendant to give up the privilege against self-incrimination by threatening to impose a penalty, like "withdraw[ing] a governmental benefit such as public employment." *Salinas*, 570 U.S. at 185 (citing *Garrity v. New Jersey*, 385 U.S. 493, 497 (1967); *Lefkowitz v. Cunningham*, 431 U.S. 801, 802-04 (1977); and *Lefkowitz v. Turley*, 414 U.S. 70, 84-85 (1973)). Such threats

make the "exercise of the privilege so costly that it need not be affirmatively asserted." *Id.* But "[i]n each of the so-called 'penalty' cases, the state not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.'" *Murphy*, 465 U.S. at 434 (quoting *Cunningham*, 431 U.S. at 806).

In one of the majority's cases, for instance, the court found that the *Miranda* waiver signed by the juvenile defendant was not voluntary because the detective, before reading the *Miranda* warnings, suggested that if the defendant "remained silent, he would face fabricated charges for things that he did not do." *In re S.W.*, 124 A.3d 89, 103 (D.C. 2015). The court described that scenario as "a 'rare' instance in which . . . a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda*." *Id.* at 92.

As the majority here concedes, neither the probation officer nor the detectives ever threatened Thomas with the loss of probation if he invoked his right to remain silent in response to the detectives' questions. *Ante* at 14 & n.8, 16. So the "penalty" exception to the invocation requirement does not apply.

Beyond these two exceptions, the Supreme Court has been reluctant "to craft . . . new exception[s] to the 'general rule' that a witness must assert the privilege to subsequently benefit from it." *Salinas*, 570 U.S. at 186 (quoting *Murphy*, 465 U.S. at 429). *Salinas*, for example, rejected a proposed "third exception to the invocation requirement for cases in which a witness stands mute [during a noncustodial encounter] and thereby declines to give an answer that officials suspect would be incriminating." *Id.* As the Court explained, "So long as police do not deprive a witness of the ability to voluntarily invoke the privilege, there is no Fifth Amendment

violation" by introducing evidence that the defendant stood silent when asked an incriminating question during a noncustodial encounter. *Id.* at 191.

### B. *No exception for probationers in noncustodial settings*

In *Murphy*, the Court rejected another proposed exception to the invocation requirement, urged by a probationer in a noncustodial setting who failed to invoke the privilege when questioned by his probation officer. 465 U.S. at 440. Although Murphy was not in custody, he had to "be truthful with the probation officer 'in all matters.'" *Id.* at 422. The Court made clear that "the nature of probation is such that probationers should expect to be questioned on a wide range of topics relating to their past criminality." *Id.* at 432.

But *Murphy* also made clear that a probationer's duty to be truthful with his probation officer did not excuse him from having to invoke the privilege when questioned about things that would incriminate him. *Id.* at 440. It makes no difference whether "the probation officer consciously [seeks] incriminating evidence." *Id.* at 431. "[P]olice officers questioning persons suspected of crimes *often* consciously seek incriminating statements," and "the probation officer's knowledge and intent [has] no bearing" on whether the probationer must invoke the privilege. *Id.* (emphasis added). The pressure that Murphy felt to speak with his probation officer was "indistinguishable from that felt by any witness who is required to appear and give testimony." *Id.* at 437. The probationer, no less than the compelled witness, must "exercise the privilege in a timely manner." *Id.* As a result, the government "may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege." *Id.* at 435.

To be sure, *Murphy* does not control the outcome here because Thomas was in custody when questioned; Murphy was not. Footnote five of *Murphy* reserved deciding whether the invocation requirement would apply to a defendant "interviewed by his probation officer while

being held in police custody or by the police themselves in a custodial setting." *Id.* at 429 n.5. But the majority here is wrong to think that footnote five renders everything else in *Murphy* irrelevant. I would hold that the invocation requirement recognized in *Murphy* applies equally to a probationer in a custodial setting, provided he is given proper *Miranda* warnings, is not coerced into confessing, and is not expressly or implicitly threatened with probation revocation for exercising his privilege against self-incrimination.

### C. Cases involving coercive threats to revoke probation

Whether or not the defendant is in custody, his confession is involuntary if obtained by threat of probation revocation for exercising his privilege against self-incrimination. As *Murphy* put it, "if the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would . . . create[] the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." *Id.* at 435.

That is precisely what happened in two of the principal cases that the majority relies on. In *State v. Eccles*, 877 P.2d 799 (Ariz. 1994) (en banc), the Arizona Supreme Court invalidated a condition of probation that required the defendant "to waive his privilege against self-incrimination." *Id.* at 800. The court said that "*Murphy* makes clear that the state cannot make waiver of the privilege against self-incrimination a condition of probation." *Id.* The court ruled that the condition could be permissibly revised, however, to require that the defendant "answer truthfully, any questions [asked by] the probation officer, counselors, polygraph examiners, or any other agent of the Probation Department's treatment programs." *Id.* at 801. "Like the condition at issue in *Murphy*, this sanitized condition would merely proscribe false statements and require defendant to respond to questions that could not incriminate him in future criminal proceedings." *Id.* "[I]t would not prohibit him from validly asserting the privilege

- 41 -

against self-incrimination and would not penalize him for so doing." *Id.* But the court was emphatic that the defendant "must assert the privilege at the appropriate time . . . if he desires not to incriminate himself." *Id.*

The majority's other principal case, *United States v. Saechao*, 418 F.3d 1073 (9th Cir. 2005), also involved a "classic penalty situation." *Id.* at 1075. *Saechao* held that a defendant's confession to his Oregon probation officer of a federal firearms offense was properly suppressed because a condition of his probation required "him to 'promptly and truthfully answer all reasonable inquiries' from the officer or face revocation of his probation." *Id.* The Ninth Circuit distinguished that probation condition from the one in *Murphy*. Murphy's condition required him "only to 'be truthful with his probation officers in all matters,' and did not impose any affirmative obligation to respond to his probation officer's questions: 'On its face, [the] probation condition proscribed only false statements; it said nothing about his freedom to decline to answer particular questions . . . .'" *Id.* at 1078 (quoting *Murphy*, 465 U.S. at 436). The Oregon probation condition was problematic, the Ninth Circuit explained, because Oregon law allowed the State to revoke the defendant's probation for refusing to answer questions that would incriminate him in separate criminal proceedings. *Id.* at 1079-80. In *Murphy*, by contrast, Minnesota had "represented that it could not (and would not) have revoked the defendant's probation had the probationer invoked the Fifth Amendment." *Id.* at 1080 n.5.

Echoing the Supreme Court in *Murphy*, the Fourth Circuit recently rejected a challenge to a federal condition of release that, like Thomas's, required the defendant "to truthfully answer questions from his probation officer." *United States v. Linville*, 60 F.4th 890, 893 (4th Cir. 2023). The court explained that the requirement to truthfully answer questions did "not actually require a choice between revocation and asserting the privilege." *Id.* It did "not expressly state that if [Linville] exercised his Fifth Amendment right to remain silent, he risked criminal

- 42 -

penalty." *Id.* And "Linville had no reasonable basis for believing that he risked revocation of his supervised release if he invoked the Fifth Amendment." *Id.* "[A]s *Murphy* emphasized, '[Supreme Court] decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege.'" *Id.* at 898 (second alteration in original) (quoting *Murphy*, 465 U.S. at 438).

The Fourth Circuit found *Saechao* unpersuasive because Oregon law permitted a defendant's probation to be revoked for invoking the privilege against self-incrimination. *Id.* at 898-99. "Unlike the Oregon law from *Saechao*, clear federal law provides that invoking the Fifth Amendment could not constitutionally be grounds for revoking supervised release." *Id.* at 898.

Thomas's probationary conditions resemble those in *Murphy* and *Linville*. Thomas was required to "report to [his] probation officer, be truthful, cooperative and report as instructed," and to "follow" his probation officer's instructions. As in *Murphy*, Thomas's probation conditions "proscribed only false statements; [they] said nothing about his freedom to decline to answer particular questions and certainly contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution." *Murphy*, 465 U.S. at 437. So the probation condition here did "not actually require a choice between revocation and asserting the privilege." *Linville*, 60 F.4th at 897.

Indeed, neither Thomas nor the majority cites any authority to suggest that Thomas's probation could be revoked if he chose to invoke the privilege in response to questions from his probation officer or the detectives. We explained nearly two decades ago that decisions of the United States Supreme Court "'have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege,' for, in doing so, the government would be imposing a penalty upon an individual who 'elects to

- 43 -

exercise his Fifth Amendment right.'" *Venable v. Commonwealth*, 48 Va. App. 380, 387 (2006) (first quoting *Murphy*, 465 U.S. at 438; and then quoting *Cunningham*, 431 U.S. at 805).

### D. The majority's implicit new exception to the Invocation Rule

The majority agrees "that the record here, including the trial court's subsidiary factual findings, does not present a 'classic penalty situation.'" *Ante* at 14. So the majority concedes that nothing said by the probation officer or the detectives, "either expressly or by implication, assert[ed] that [Thomas's] invocation of the privilege would lead to revocation of probation." *Id.* at 14 n.8 (quoting *Murphy*, 465 U.S. at 435). Upon that premise, the majority insists it is creating "[n]o new per-se rule" establishing an exception to the invocation requirement when a probation officer is involved in a custodial interrogation. *Id.* at 19. Instead, the majority says that it is simply considering the probation officer's request that Thomas speak with the detectives "as a relevant circumstance to be considered as one factor in the voluntariness analysis." *Id.* at 20 (quoting *People v. Stewart*, No. 162497, 2023 WL 4874412, at \*10 (Mich. July 31, 2023)). The majority also downplays the significance of this case, characterizing it as an outlier involving "unique" circumstances. *Id.* at 15, 26.

The majority's assurance that it does not view this case as a "classic penalty situation" is difficult to square with its reliance on *Eccles* and *Saechao*, cases that *did* involve threats to revoke the defendant's probation if he invoked the privilege. It is also difficult to see how, under the majority's logic, law-enforcement officers could *ever* involve a probation officer in a custodial interrogation without being required to give special warnings going beyond *Miranda*.

Although the majority denies imposing such a per-se warning requirement, its opinion repeatedly implies that the probation officer or the detectives here *had* to tell Thomas that he could invoke his Fifth Amendment privilege without jeopardizing his probation. The majority says, for instance, that

- 44 -

- the detectives failed to "provide any assurance" to Thomas "that no penalty would be exacted if he disregarded Samluk's instruction to 'chat with'" them;

- *Miranda* warnings alone were insufficient because they did not "clarify" that the probation officer's request for Thomas to speak with the detectives "had no bearing on Thomas's right to remain silent";

- neither the probation officer nor the detectives "clarified that Thomas would *not* suffer any adverse probationary consequences" if he invoked the privilege; and

- despite the *Miranda* waiver signed by Thomas, "the officers provided no additional procedural safeguards to cure [the] problem" that the majority says was caused by the probation officer's asking Thomas to chat with the detectives.

*Ante* at 18, 21.

The majority wrongly suggests that such mandatory disclosures in a custodial setting—on top of standard *Miranda* warnings—are required by the Supreme Court's decision in *Seibert*, 542 U.S. at 600. *Id.* at 18, 20-21. They're not. "*Seibert* provides a narrow exception to the general rule" that *Miranda* warnings suffice to inform a suspect of his constitutional rights. *Keepers v. Commonwealth*, 72 Va. App. 17, 38 (2020). Although no single opinion in *Seibert* commanded a majority, the Court invalidated a confession obtained by police who deliberately circumvented *Miranda* by using the two-step, question-first method of interrogation. *Seibert*, 542 U.S. at 604-05 (plurality). Police first obtained a confession from an un-*Mirandized* defendant in custody, then administered *Miranda* warnings, and then obtained the same confession again for use in court. *Id.* "The object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611. "What is worse, telling a suspect that 'anything you say can and will be used against you,' without expressly excepting the statement just given, could lead to an entirely reasonable

inference that what he has just said will be used, with subsequent silence being of no avail." *Id.* at 613.

Justice Kennedy concurred in the judgment in *Seibert* on the narrowest grounds, *see id.* at 618-22, so "his concurring opinion . . . provides the controlling law," *Secret v. Commonwealth*, 296 Va. 204, 222 (2018) (quoting *United States v. Street*, 472 F.3d 1298, 1313 (11th Cir. 2006)). "Under Justice Kennedy's subjective-intent based test, in such cases where 'an interrogator uses this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps.'" *Id.* at 223 (quoting *Seibert*, 542 U.S. at 621 (Kennedy, J., concurring in the judgment)). But Justice Kennedy made clear that this test applies "*only* in the *infrequent case* . . . in which the two-step interrogation technique [is] used in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 622 (emphases added).

*Seibert* is not on point because this case does not involve the two-step interrogation technique condemned there. But even if we were to read *Seibert* expansively to condemn all police tactics intended to coerce a *Miranda* waiver, that case would not help the majority. For the facts here fail to show that anyone intended to trick Thomas into waiving his Fifth Amendment rights.

Judge Bernhard specifically found that the probation officer introduced the detectives to Thomas because "he was just being helpful and courteous." The court further found that the probation officer's statement to Thomas to "chat with them today" did *not* amount to a directive. The probation officer did not say, "Answer all their questions truthfully . . . 'or else,' in so many words, using the power of probation." When asked if he had introduced the detectives to Thomas in order to "trick" Thomas into confessing, the probation officer testified,

unequivocally, "absolutely not." Judge Bernhard found, instead, that the officers were "trying to make the accused feel at ease, and he appeared at ease."

Those subsidiary factual findings, amply supported by the record, preclude requiring a *Seibert*-like warning. Such subsidiary factual findings "are entitled to a presumption of correctness." *Secret*, 296 Va. at 225 (quoting *Midkiff v. Commonwealth*, 250 Va. 262, 268 (1995)). They cannot be set aside unless "plainly wrong or without evidence to support [them]." *Id.* at 226 (alteration in original) (quoting *DeMille v. Commonwealth*, 283 Va. 316, 323 (2012)). Subsidiary factual findings include whether the trial court found the absence of "coercion" during the interrogation, *id.* at 226, and whether law-enforcement officers acted deliberately to circumvent *Miranda*, *id.* at 223-24.

To sum up, when the government does not expressly or implicitly threaten the defendant with probation revocation for invoking his Fifth Amendment rights, the traditional invocation requirement applies as stated in *Murphy* and *Salinas*. There is no reason *not* to apply that rule in a custodial setting when, as here, law-enforcement officers have properly advised the defendant of his constitutional rights. Properly administered *Miranda* warnings will normally suffice to apprise such defendants of the privilege against self-incrimination. It is then up to the defendant whether to invoke his right to remain silent in response to questions that could incriminate him.

### E. Thomas's voluntary Miranda waiver

I would resolve this case by applying the traditional standard to determine the voluntariness of Thomas's *Miranda* waiver. The trial court must consider whether, under "the totality of the circumstances, the free will of the suspect was overborne." *Thomas v. Commonwealth*, 72 Va. App. 560, 580 (2020). In doing so, "the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Secret*, 296 Va. at 220 (quoting *Elstad*, 470 U.S.

at 318). Voluntariness is a question of law that we review do novo on appeal. *Id.* at 225. But subsidiary factual determinations by the trial court are presumed correct and will not be set aside unless plainly wrong or without evidence to support them. *Id.* "The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." *Id.* at 220 (quoting *Elstad*, 470 U.S. at 318).

Applying that traditional standard, I conclude that Thomas's will was not overborne and that the waiver of his Fifth Amendment rights and his confession were voluntary. To start, I note that Thomas followed along as Detective Carter read him the *Miranda* warnings, printed on the "Warning and Consent" form. The trial judge too "thought the most important [evidence] was where [Thomas] is given his *Miranda* Rights." Carter *twice* said he was investigating Thomas for "Sexual Assault." And Thomas showed that he knew what that meant: he tilted his head left and right before tilting forward and resting his head in the palm of his hand for several seconds, crestfallen.

Detective Carter then carefully reviewed with Thomas each *Miranda* warning. Carter read the first warning aloud: "I have the right to remain silent. I am not required to say anything to anyone at any time or to answer any questions." Carter paused and asked Thomas, "Does that one make sense?" Carter nodded his head in the affirmative. Next, Carter read aloud, "Anything I do or say can and will be used against me in a court of law." Carter asked Thomas, "Understand?" Thomas again nodded in the affirmative. Carter then added, "if you have questions, please let me know, okay?" And Thomas *again* nodded his head in the affirmative.

Detective Carter next read, "I have the right to talk to a lawyer before being questioned, and I also have the right to have the lawyer with me while being questioned." Carter asked, "Pretty straightforward?" Thomas again nodded his head in the affirmative; he also showed his understanding by saying, "Yeah." True, Thomas did not nod or react after Carter read the fourth

and fifth warnings aloud, elaborating on Thomas's right to counsel.[25]  But after reading all five

warnings, Carter asked if "all five" of them "make sense?  They're all pretty straightforward but

I always want to doublecheck to make sure."  Thomas responded, "Yeah—I can't believe this is

happening again."

Carter then read Thomas the "Consent to Speak" text on the waiver form, where the

suspect's signature was requested.  It said, "I know what my rights are.  I am willing to make a

statement without a lawyer present.  I understand and I know what I am doing.  No promises or

threats have been made to me by anyone."  Carter told Thomas, "You don't have to sign it.  It

helps if you do.  But you can still agree to talk to us if you don't want sign it.  So it's up to you.

Do you mind signing right here for me?"  Thomas responded, "Yeah," and he signed the waiver.

The majority errs in minimizing the significance of Thomas's express *Miranda* waiver,

claiming that Detective Carter characterized Thomas's signing the form as a "mere formality"

and some kind of bureaucratic exercise.  *Ante* at 22, 25.  For one thing, Carter made clear to

Thomas that he was not required to sign the waiver.  The video shows that Thomas did so

willingly.  For another, binding precedent instructs us that Thomas's "express written and verbal

statements of waiver of his rights are strong proof of the validity of his waiver."  *Angel v.

Commonwealth*, 281 Va. 248, 259 (2011).

---

[25] Those warnings were:

> 4. If I cannot afford a lawyer, and want one, one will be provided
> to me.

> 5.  If I want to answer questions now without a lawyer present, I
> will still have the right to stop answering questions at any time.  I
> also have the right to stop answering questions at any time if I
> want to talk to a lawyer.

In fact, we have rejected claims that police "diluted" *Miranda* warnings by downplaying their significance to a suspect, such as when police described the warnings as "just procedural stuff." *Keepers*, 72 Va. App. at 29, 37. What is important here is that Thomas was apprised of his "*Miranda* rights" and told he "was free to refuse to answer any questions and could stop talking any time." *Id.* at 37. He then "signed a pre-printed form listing [his] *Miranda* warnings, and [he] did not express any confusion or hesitation in [his] discussions with police." *Id.* Whether a defendant fails to fully appreciate that it may harm his legal interest to speak with law-enforcement officers, rather than remain silent, "does not affect the validity of his waiver." *Tirado v. Commonwealth*, 296 Va. 15, 29 (2018) (quoting *United States v. Yunis*, 859 F.2d 953, 965 (D.C. Cir. 1988)).

After Thomas voluntarily waived his Fifth Amendment rights, the officers then took a bathroom break, telling Thomas that he could use the bathroom whenever he needed. When the group returned from the first bathroom break, the detectives removed the handcuff securing Thomas's left arm to the table, and they conducted the rest of the interview without restraints.

The video recording matches the testimony of the detectives and the probation officer at the suppression hearing. They never threatened Thomas. The detectives and the probation officer said they did not intend to trick Thomas into speaking with them. The detectives' tones were "[c]onversational," "friendly, professional and respectful."

Judge Bernhard specifically found that the detectives' interrogation "was professionally done." As noted above, the trial court found that the probation officer introduced the detectives to be "helpful and courteous," trying to make Thomas feel "at ease"—not to pressure him into waiving his right to remain silent for fear of having his probation revoked. Judge Bernhard found that Thomas understood "what was going on."

The majority is wrong to hint that the detectives acted malignly because they had "*never*" previously asked a probation officer to introduce them to a suspect for a custodial interrogation. *Ante* at 4, 16.  The majority overlooks that the probation officer testified that "these are routine things that we do to help the police."  And in any case, the majority cannot point to any custom-and-practice evidence to impugn what the probation officer did here.  That gap in the majority's argument contrasts with *Seibert*, which canvassed several sources to show that the two-step, question-first interrogation method had gained "popularity" across the country to evade *Miranda.  See Seibert*, 542 U.S. at 609-11 & nn.2-3 (plurality).

Judge Bernhard buttressed his conclusion that Thomas voluntarily waived his rights by finding that Thomas's decision was "partially based on his prior experiences" with law enforcement.  As the majority notes, "Thomas had more than a dozen police contacts during the 2012 investigation and at one point provided a voluntary statement after being read his *Miranda* rights."  *Ante* at 5.  But the majority then draws the wrong inference: that Thomas's "experience with the criminal justice system . . . rendered him *more susceptible*" to government coercion.  *Id.* at 24 (emphasis added).  Our caselaw shows that the *opposite* inference—drawn by Judge Bernhard—is more appropriate.  *See, e.g.*, *Midkiff*, 250 Va. at 269 (finding Midkiff's confession to be voluntary, noting that he was "no stranger to the criminal justice system . . . .  It is apparent that Midkiff has experienced several prior police interrogations."); *Washington v. Commonwealth*, 43 Va. App. 291, 304 (2004) (stating that the defendant "was well experienced in dealing with the police, having previously been convicted of three felonies").

The majority overemphasizes that the detectives would have known that Thomas attended an alternative school and "that an earlier police report had described Thomas as 'intellectually disabled.'"  *Ante* at 24.  In fact, Thomas "graduated 12th grade" and could read and write.  The majority's emphasis is also misplaced because our precedents make clear that a

defendant's diminished mental capacity is not enough to show that his waiver of rights was involuntary. *E.g.*, *Terrell v. Commonwealth*, 12 Va. App. 285, 292 (1991) (finding waiver voluntary, despite that defendant had "an IQ between 71 and 75," because he "had experience with the criminal justice system through four previous felony convictions"); *see also Murphy*, 465 U.S. at 433 ("Murphy's regular meetings with his probation officer should have served . . . to insulate him from psychological intimidation that might overbear his desire to claim the privilege.").

In short, the majority opinion fails to fully credit the trial court's subsidiary factual findings. Those findings are not plainly wrong or without evidence to support them. They are amply supported by the interrogation video and the witnesses' testimony at the suppression hearing.

On the ultimate question of voluntariness, Judge Bernhard found that Thomas voluntarily waived his privilege against self-incrimination after being informed of his right to remain silent:

> [I]t appeared that based on his—partially based on his prior experiences, on his demeanor, that he knew full well what was going on and that he made [a] voluntary choice to waive his right against self-incrimination after he was advised that he didn't need to speak to the police and that it wouldn't be held against him . . . .
>
> And maybe there was an element there that . . . the officers were very professional, they were kind to him, they got him food, they got him at ease, and he took the occasion to kind of pour his heart out and maybe take responsibility for things that he indicated he had done . . . .
>
> But under the totality of the circumstances, I find that his *Miranda* waiver was voluntary, knowing and intelligent . . . .

Upon de novo review, *Secret*, 296 Va. at 225, I agree that Thomas's *Miranda* waiver was voluntary, knowing, and intelligent.

The probation officer's statement that Thomas should "just go ahead and chat with" the detectives did not threaten the revocation of his probation for invoking the privilege against

self-incrimination. The probation officer made "no suggestion that [Thomas's] probation was conditional on his waiving his Fifth Amendment privilege." *Murphy*, 465 U.S. at 437. Nor is there any evidence that Thomas confessed "because he feared that his probation would be revoked if he remained silent." *Id.*

"'The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by *Miranda*."'" *Seibert*, 542 U.S. at 611 (plurality) (quoting *Eagan*, 492 U.S. at 203). Here, the detectives' very careful *Miranda* warnings did just that. And even assuming for argument's sake that Thomas "harbor[ed] a [subjective] belief that his probation might be revoked for exercising the Fifth Amendment privilege"—something not supported by anything in this record—"that belief would not have been reasonable." *Murphy*, 465 U.S. at 438. For the Supreme Court has made clear that "the State [cannot] constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." *Id.*; *Linville*, 60 F.4th at 898 (same); *Venable*, 48 Va. App. at 387 (same).

In sum, Thomas's motion to suppress his confession was properly denied.

II. The trial court properly excluded the testimony of Thomas's mother.

Because the Court reverses Thomas's six convictions for crimes against A.R., remanding those counts for a new trial should the Commonwealth be so advised, the majority does not reach Thomas's first assignment of error. *Ante* at 26-27 n.19. Thomas argues that the trial court erred by excluding testimony from his mother during the guilt phase of the case. Because I would affirm the convictions, I address that argument here.[26]

---

[26] The majority also does not reach Thomas's challenge to the sentence imposed on the convictions involving A.R. *Ante* at 32 n.24. But I would hold, for the same reasons given by the majority in rejecting Thomas's challenges to the other sentences, *id.* at 32-33, that the trial court did not err in sentencing Thomas for his crimes against A.R. Thomas does not dispute that the four life sentences (imposed on two counts of rape and two counts of animate-object penetration) were permitted under Code §§ 18.2-61 and 18.2-67.2. *See Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) ("[W]hen a statute prescribes a maximum imprisonment penalty and the

The defense proposed calling Thomas's mother, Jacqueline Thomas Black, to testify about Thomas's slow development and diminished intellectual functioning. In support of the proffer, the trial judge permitted defense counsel to question Black outside the presence of the jury. Black described Thomas's slow development from about the "age of one" and the difficulties he had remembering things into adulthood. Thomas's mother had to lay out his clothes for him. She used "little cards" and a "chart" to remind him to do such things as brush his teeth, put on deodorant, put on socks, and use soap when showering. And when Thomas lived by himself, his friends would sleep in his house, borrow his things, and eat his food.

The Commonwealth moved to exclude Black's testimony, arguing that it was inadmissible mental-condition evidence under Code § 19.2-271.6 and that the defense had failed to provide the required notice of its intent to introduce such evidence. The defense responded that the evidence was not being offered to show that Thomas "did not have the intent required for the offense charged." Code § 19.2-271.6(B). Instead, the evidence was offered to show that Thomas's statements in his confession were entitled to less weight because of his "susceptibility" to questioning and his faulty memory.

Thomas relied on *Crane v. Kentucky*, 476 U.S. 683 (1986), and *Pritchett v. Commonwealth*, 263 Va. 182 (2002). In *Crane*, the Supreme Court held that a defendant has a due-process right to present evidence at trial "about the physical and psychological environment in which the confession was obtained" to show that his confession "was unworthy of belief."

---

sentence does not exceed that maximum, the sentence will not be overturned as being an abuse of discretion." (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007))). And Thomas's claim is without merit that the trial court "made no mention of any mitigation, or even that it considered mitigation in fashioning its sentence." Thomas ignores the trial court's statement at sentencing that it had "considered all of the things that [were] presented by both sides." "Barring clear evidence to the contrary, this Court will not presume that a trial court purposefully ignored mitigating factors in blind pursuit of a harsh sentence." *Bassett v. Commonwealth*, 13 Va. App. 580, 584 (1992). Thomas offers no such "clear evidence" here.

476 U.S. at 684, 691. The defendant's right to present such evidence is not affected by the fact that the trial judge determined the confession to be voluntary, nor by the fact that the defendant "marshaled the same evidence earlier in support of an unsuccessful motion to suppress." *Id.* at 689. Applying *Crane*, our Supreme Court held in *Pritchett* that the trial court erred in excluding the testimony of the defendant's two mental-health experts. 263 Va. at 187. The experts would have testified to Pritchett's intellectual disabilities and the "susceptibility" of such persons "to suggestive police interrogation in connection with the defendant's contention that his confession was unreliable." *Id.* at 183.

After hearing Black's testimony, the trial court excluded it as "too speculative to sync up to [Thomas's] confession in 2019."[27] I would find no abuse of discretion in that ruling.

An "accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). The Constitution permits the exclusion of evidence that is "only marginally relevant" or that "poses an undue risk of . . . confusion of the issues." *Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006) (quoting *Crane*, 476 U.S. at 689-90). "The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." *Barnes v. Commonwealth*, 33 Va. App. 619, 626 (2000) (quoting *Crews v. Commonwealth*, 18 Va. App. 115, 118 (1994)).

"'Relevant evidence' means evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401. "Evidence that is not relevant is not admissible." Va. R. Evid. 2:402(a). "Evidence of collateral facts or those incapable of affording any reasonable presumption or inference on

---

[27] Although the trial court excluded Black's testimony in the guilt phase, the defense detailed Thomas's intellectual challenges at sentencing.

matters in issue, because too remote or irrelevant, cannot be accepted in evidence." *McMillan v. Commonwealth*, 277 Va. 11, 22 (2009) (quoting *Smith v. Commonwealth*, 223 Va. 721, 723 (1982)). In other words, "evidence that produces only speculative inferences is irrelevant . . . and should be excluded." 29 Am. Jur. 2d *Evidence* § 295 (2019).

Our opinion in *Barnes* provides a good example of evidence that was properly excluded as too attenuated and speculative. The trial court there barred a defense witness from testifying that Barnes "worked five days a week doing manual labor for minimum wage." 33 Va. App. at 624. Barnes argued that the evidence showed that he "was not a drug dealer," since "a drug dealer who was making $600 per day would not engage in minimum wage work." *Id.* We upheld the witness's exclusion, however, because Barnes "neither proffered nor presented evidence of the relationship between minimum wage employment and drug dealing," thus requiring the factfinder "to speculate as to that relationship." *Id.* at 626. Moreover, the time frame when Barnes worked the minimum wage job ended before the period when he allegedly used an underling to sell drugs. *Id.* So the "proffered testimony" also "concerned facts remote in time." *Id.* at 626-27.

The trial court here likewise did not abuse its discretion in excluding Black's testimony as "too speculative to sync up to [Thomas's] confession in 2019." Black did not describe any instance in which Thomas was encouraged by others to admit to something he did not do. And the defense presented no connection—no "evidence of the relationship," *Barnes*, 33 Va. App. at 626—between Thomas's slow development and forgetfulness, on the one hand, and his being prone to falsely confess to police, on the other. The examples offered by Black about Thomas's behavior in his younger years were also "remote in time," *id.* at 627, to his confession in 2019, when Thomas was 35 years old.

Excluding that testimony did not violate *Crane*. *Crane* entitled Thomas to "introduce testimony about the physical and psychological environment in which the confession was obtained" to show that his incriminating statements were "unworthy of belief." 476 U.S. at 684. But Black's testimony did not address Thomas's confession. The jury would have had to engage in rank speculation to connect Black's testimony about Thomas's developmental issues when younger to his suggestibility or propensity to falsely confess at age 35.

Nor did the trial court's ruling violate *Pritchett*, where the trial court erred by disallowing the testimony of two "experts in the field of psychology." 263 Va. at 185. Their testimony directly addressed the risk of false confessions and was admissible under *Crane* "to assist the jury in determining whether the confession was reliable." *Id.* at 186. One expert, a clinical neuropsychologist, testified that her testing showed that Pritchett had an IQ of 69 and was intellectual disabled. *Id.* at 185. The other, a forensic psychologist, testified that such low IQ's correlate with a tendency to "go along with [authority] figures" and with "leading questions." *Id.* (alteration in original). That expert had also administered a test to Pritchett to confirm his willingness to go along with the questioner. *Id*. at 185-86. Black, by contrast, was not a mental health expert and her testimony did not address Thomas's susceptibility to leading questions, let alone his propensity to admit to things he did not do.

In short, the trial court did not err by excluding Black's testimony.

\* \* \*

There is much in the majority's opinion with which I agree. But the majority commits a grave error by tacking a codicil onto standard *Miranda* warnings for cases involving probationers in custodial settings. This new exception to the invocation requirement finds no support in our caselaw or that of any other jurisdiction. The cost of that error here is to vacate Thomas's four life sentences for his vile crimes against A.R. That is bad enough. What is worse—and

incalculable—is the disruption the majority's stealth rule will inject into future cases in which probation officers have any involvement in custodial interrogations. "*Miranda*'s clarity is one of its strengths . . . ." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). What the majority does today only "undermine[s] that clarity." *Id.*